G6RAACAJ1                          Bench Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LUIS CAJAMARCA,

                    Plaintiff,

          v.                                15 CV 8244 (GHW)

AZEM HASANGJIKAJ, SEGUNDO
CALLE and YERINA RESTAURANT
CORP.,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        June 27, 2016
                                        9:00 a.m.

Before:

                    HON. GREGORY H. WOODS,

                                        District Judge

                         APPEARANCES

THE LAW OFFICE OF WILLIAM CAFARO
     Attorney for Plaintiff
BY:  AMIT KUMAR

NATE STRAND
     Attorney for Defendants
BY:  NATHANIEL L. STRAND

1           THE COURT:  You can be seated.

2           (Case called)

3           MR. KUMAR:  Amit Kumar, Law Offices of William Cafaro,

4    for the plaintiff Luis Cajamarca.

5           With me at the table is Mr. Cajamarca, a translator,

6    and my paralegal, Nicholas Durand.  I ask that Mr. Durand be

7    allowed to sit at the table in case the translator needs to be

8    excused for some reason, that way he can also act as

9    translator.

10          THE COURT:  If he is a certified translator he could

11   act as a translator.  Otherwise it is not apparent that me that

12   he is qualified.  Is he a certified translator?

13          MR. KUMAR:  No.

14          THE COURT:  I hope that your translator will be able

15   to stay.

16          MR. KUMAR:  Yes, your Honor.

17          THE COURT:  Thank you.

18          MR. KUMAR:  Thank you, your Honor.

19          MR. STRAND:  Nate Strand, on behalf of the defendants,

20   your Honor.

21          THE COURT:  Thank you.  Good morning.

22          We're here to begin a bench trial in this matter.  We

23   have had a comprehensive final pretrial conference, so I hope

24   that we'll be able to begin this trial promptly.  Is there

25   anything that either of you would like to raise with the Court

G6RAACAJ1                      Bench Trial

1    before we begin with the parties' opening statements?

2              Counsel.

3              MR. KUMAR:  Nothing from the plaintiff, your Honor.

4              THE COURT:  Thank you.  Mr. Kumar.

5              MR. STRAND:  Yes, your Honor.  My sincerest apology.

6    My client is not here.  I texted him repeatedly including last

7    night but he's running late.  I guess the best way to deal with

8    this is a maybe take a short recess after the opening

9    statements so I can find him because my phone is downstairs.

10             THE COURT:  Thank you.  Yes, let's proceed.

11             What I will ask is that if you wish, Mr. Strand, you

12   could give your client's phone number to my court staff and

13   they can try to contact him during opening statements so that

14   some effort is being made to ascertain his whereabouts.  If we

15   get him on the line we would immediately recess so that you

16   could talk with him.  We would not discuss anything substantive

17   with him but I don't want the question of his whereabouts to be

18   weighing on you.  Would that be an appropriate approach?  What

19   other to alternatives would you suggest?

20             MR. STRAND:  That is a beautiful approach.  Thank you,

21   your Honor.  Are you ready for the telephone number?

22             THE COURT:  Thank you.  You can hand it forward.

23             (Pause)

24             THE COURT:  Good.  Counselor, are we ready to proceed?

25             MR. STRAND:  Yes, your Honor.

G6RAACAJ1                    Bench Trial

1              MR. KUMAR:  Yes, your Honor.

2              THE COURT:  Good.  Thank you very much.

3              Let's begin with the parties' opening statements.  Let

4      me start with you if I can please, Mr. Kumar.

5              MR. KUMAR:  Yes, your Honor.  May I use the lectern?

6              THE COURT:  Please do.

7              MR. KUMAR:  Good morning and may it please the Court,

8      this case like all wage an hour cases is a case about

9      fundamental fairness, about the ideas set out in the wake of

10     the Great Depression.  If an employee works over 40 hours in a

11     given week then he is entitled to more than his standard wages.

12     My client Luis Cajamarca is an immigrant who speaks limited

13     English.  The defendants are adept businessmen who have

14     successfully navigated the notorious New York City restaurant

15     industry for over 20 years.  As part of the running of their

16     business the defendants hired my client and have unfairly

17     denied him his overtime wages for hours he worked over 40 in a

18     given week.

19             Mr. Cajamarca was hired by the defendants as a pasta

20     man on April 25, 2014 and worked continuously in that position

21     until September 10, 2015.  As a pasta man Mr. Cajamarca's main

22     duties included making pasta and grilling meats for defendants'

23     customers.  When the kitchen closed at the end of the night

24     Mr. Cajamarca would clean his station and head home.

25     Throughout his employment with the defendants he worked the

G6RAACAJ1                          Bench Trial

1   same weekly schedule.   Every Tuesday and Thursday he worked

2   from 11:30 a.m. until ten p.m.   Every Friday and Saturday he

3   worked from 3:30 p.m. until 12 a.m. and finally, every Sunday

4   he worked from 3:30 p.m. until 10 p.m.   This amounts to 44 and

5   a half hours per week.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. KUMAR:  This amounts to 44 and a half hours per

2     week.  For his labor Mr. Cajamarca was paid a flat salary of

3     $700 per week.  This consisted of a net payment of $390 per

4     week via check and $310 per check in cash.  At no point did

5     anyone explain to Mr. Cajamarca that this salary was for any

6     overtime wages or for any overtime hours.

7          Now, I would like the Court to keep in mind that many,

8     but not all, of the facts that I have layed out are undisputed

9     by the parties in this action.  Mr. Cajamarca and the

10    defendants agree upon many of the facts alleged in the

11    plaintiff's complaint, like his start date, his end date, the

12    fact that he was paid a salary instead on an hourly basis and,

13    lastly, that that salary amounted to $700 net per week.

14         As far as the defendant's evidence, I have an

15    indication that they are basing their entire defense on

16    Mr. Hasangjikaj's best recollections of when Mr. Cajamarca

17    actually worked.  They have not produced any documentation

18    concerning the exact number of hours Mr. Cajamarca worked and

19    relied only on the fact that they paid him on a salary basis

20    for their recordkeeping shortcomings.

21         At the end of the presentation of evidence the

22    plaintiff will be asking for what in fairness he deserves.  He

23    will be requesting payment of the overtime wages he never

24    received, payment of any spread of hours wages, as well as any

25    other remedy that he is fairly entitled to under federal and

1    New York State law.  Thank you.

2              THE COURT:  Mr. Strand, let me turn to you.

3              MR. STRAND:  Thank you, Judge.  If I'm going too fast

4    for you all, just hold up your hand.  I would hate to burden

5    our gracious staff here.

6              Mr. Kumar began his statement with this discussion of

7    fundamental fairness.  I agree with that and I think we should

8    also be fair to all the parties in what we will accept as

9    sufficient proof of an overtime wage that was paid.  Thus far

10   the testimony that was submitted in the direct testimony

11   affidavit was kind of vague.  It was 31 words long as to the

12   hours.  So I am going to ask some questions about that.  Mr.

13   Kumar mentioned immigrants.  I kind of chuckle because my

14   client, Mr. Hasangjikaj, who is also an immigrant, speaks

15   limited English, as you will see, if he hopefully gets here, my

16   hope is.

17             I also need to correct a misstatement in Mr. Kumar's

18   opening statement.  He said 20 years.  It's actually about 30

19   years, since the '80s the restaurant has been opened.  And they

20   have never had a complaint, never a labor complaint, not one.

21   And this was indicated in Mr. Hasangjikaj's direct testimony.

22   After 30 years suddenly we decide to be shysters?

23             Anyway, as Mr. Kumar indicated, we do agree generally

24   with the scope of work.  He said something about grilling

25   meats.  I think he cooked pasta.  He boiled, or whatever he

1    did.  He cooked the ziti or the penne, whatever.  I don't know

2    that he said he cooked meats.  I don't know if it's a relevant

3    distinction, but I thought I would point that out.

4              As for him working the same schedule, we are going to

5    talk about a little bit in Mr. Hasangjikaj's direct testimony,

6    the scheduling is based on shifts.  It's a restaurant and there

7    is a lunch shift and there is a dinner shift and they schedule

8    based on the shifts and to that extent Mr. Hasangjikaj agreed,

9    yes, he worked a certain number of dinners and a certain number

10   of lunches.  I think he said one lunch.  It was usually one

11   lunch and five dinners.  And what he testifies to is that the

12   actual times fluctuate.  For example, dinner shift starts at 5

13   and in the summertime it might be a little bit earlier, like 9

14   p.m. that the kitchen closes down, whereas in the winter it

15   might be as late as 10 or 11.  He says it was a little later on

16   weekends, on Fridays and Saturdays, 10:30, 11.  He said like on

17   Sundays the kitchen closed at 10.  The schedule did fluctuate

18   to that extent and that makes sense when we are talking about

19   restaurants.

20             As far as the actual days, and this will get me into

21   the next point, there might be a disagreement.  The 390 check

22   and the 310 cash, I believe that's correct, and Mr. Hasangjikaj

23   testified that that is what the plaintiff asked.  He said he

24   wanted to be paid part on a 1099.  I don't think it matters for

25   purposes of anything, but, yes, that's how he was paid.

G6RMCAJ2                       Opening – Mr. Kumar

1            As far as Mr. Kumar's statement that we are relying on

2    the best recollection of Mr. Hasangjikaj and that we don't have

3    any documentation, that's absolutely wrong.  We do have

4    documentation.  Bear with me.  I disclosed pages and pages of

5    documentation and if you take a look at these, and we will look

6    at these and you can obviously look at them when you decide on

7    this case, if you look at these records you will see that they

8    don't always just say 40.  Sometimes -- I'm looking at 40, 30.

9    I won't point to a specific page at this point.  You can look

10   at it on your own time.

11           The first page he disclosed shows that they do keep

12   track of the shifts, and I think what Mr. Kumar is referring to

13   is something that Mr. Hasangjikaj said in his deposition, that

14   he said the records overstated the hours worked because when

15   you work six shifts and the shifts are from four to six hours,

16   that's at most maybe around 36 hours.  They recorded it as 40

17   for recordkeeping purposes because he didn't dock their pay

18   when they got done at 9 instead of 10, instead of 11.

19           The other side of this case is using the fact that we

20   overreported their hours to say that the hours are not

21   accurate.  Now, the hours are not accurate but in an irrelevant

22   way.  The hours do reflect that no overtime was worked or the

23   records do reflect that, and he is sensitive to that.  He says

24   in his direct testimony, I don't want to have to pay overtime

25   premiums because I can't afford it.

1          Anyway, I think this really -- anyway.  And you can

2    see from the evidence produced, and this is an example of

3    cherrypicking.  Mr. Kumar is probably going to maybe quote the

4    deposition where he said no, I didn't write that when he came

5    in, but his head waiter did.  This is classic distortion of the

6    truth.  He testified that his head waiter, Willie -- it's

7    spelled with a V.  It looks like Vilson, but it's pronounced

8    Wilson -- did keep track of when the employees were working,

9    and you can see that from the picture that we produced, and

10   that makes sense because a business would want to know that

11   your employees are showing up to work.  This statement that

12   it's only based on Mr. Hasangjikaj's recollection is not true.

13   We have demonstrated that we have a system to keep track of

14   when employees work and the shifts that they work, which days.

15   And Mr. Kumar is correct.  We didn't record -- it's not a punch

16   clock.  We don't say, he came at 5:02.  But we did record the

17   shifts and put them in for purposes of payroll.  We didn't

18   retain sheets.  That's acceptable under federal regulations.

19   They say you can use checkmarks for a shift if you know what

20   the shift is.

21          Anyway, that goes to the exact number.  These records

22   were inaccurate, Mr. Hasangjikaj said, to the extent they

23   overstated the hours.  They are not inaccurate to the extent

24   they reflect that no overtime was worked.  We will let the

25   testimony go forward.

1          The main points I want to focus on in the course of

2    this trial are, one, the direct testimony affidavit we got so

3    far was really vague, 31 words.  It was qualified.  It said to

4    my best recollections.  Obviously, I would like to ask him

5    about that.

6          And there has also been some inconsistent

7    representations in this case.  I'm not necessarily saying it

8    was the plaintiff.  But, for example, the complaint said that

9    we didn't keep any records of the pay.  Now he admits that he

10   got pay stubs.  Anyway, that's an inconsistency and another

11   inconsistency in the complaint said that the head cook,

12   Mr. Segundo Calle, who was also a defendant here, was the one

13   who fired him.

14         Now the testimony, as you know, it was Mr. Hasangjikaj

15   who fired him.  I am not saying that the plaintiff said that.

16   I don't know.  Maybe it got lost in the shuffle or something.

17         Anyway, I'm looking forward to hearing Mr. Cajamarca,

18   his testimony, just asking him a few questions about this

19   because the testimony is very vague.  I just want to clarify a

20   few points.  It will not take long.  That being said, thank

21   you, your Honor.

22         THE COURT:  Thank you, Mr. Strand.

23         Mr. Kumar, would you please call your first witness.

24         MR. KUMAR:  Plaintiff calls Luis Cajamarca.

25   LUIS CAJAMARCA,

1          the plaintiff, called as a witness on his own behalf,

2          having been duly sworn, testified as follows:

3          THE COURT:  Before we proceed let me engage in a short

4    colloquy with the interpreter.  Would you mind please just

5    confirming that you are federally certified interpreter.

6          THE INTERPRETER:  Yes, your Honor.  This interpreter

7    is certified by the United States Office of the Administrative

8    Courts, the Administrative Office of the United States courts.

9          THE COURT:  And have you taken the oath to interpret

10   properly?  If not, what I suggest is that Mr. Daniels swear you

11   briefly now.

12         THE INTERPRETER:  Most certainly, your Honor.  The

13   interpreter has a continuous oath with the court with the

14   Southern District.

15         THE COURT:  Thank you very much.  If it's on file,

16   that's sufficient.  Thank you very much.

17         Please proceed, Mr. Kumar.

18         MR. KUMAR:  Your Honor, I have the plaintiff's direct

19   testimony.

20         THE COURT:  Please hand it forward.  Is it marked?

21         MR. KUMAR:  Not as an exhibit, your Honor.

22         THE COURT:  Please hand it forward.

23         Counsel, we are going to mark this as you have

24   proffered it to Mr. Cajamarca.

25         MR. KUMAR:  Yes, your Honor.

1    DIRECT EXAMINATION

2    BY MR. KUMAR:

3    Q.  Mr. Cajamarca, I am going to show you your declaration in

4    this case.

5            MR. KUMAR:  Your Honor, may I approach the witness?

6            THE COURT:  Please do.

7    Q.  Mr. Cajamarca, can you read the header on top of the piece

8    of paper for me, please.

9    A.  This one?

10   Q.  Yes.

11   A.  Not this one.  I can't pronounce it in English.

12   Declaration of Luis Cajamarca.

13   Q.  Can you flip to the last page, please.  Is that your

14   signature there?

15   A.  Yes.

16   Q.  Did you come into my office and sign that declaration?

17   A.  Yes.

18   Q.  And it was read to you in Spanish before you signed it?

19   A.  Yes.

20   Q.  And that is your true and correct testimony in this action?

21   A.  Yes.

22           MR. KUMAR:  Plaintiff would like to admit

23   Mr. Cajamarca's declaration in this action as his direct

24   testimony.

25           THE COURT:  Thank you very much.  I am going to

1   propose that we mark Mr. Cajamarca's declaration as Exhibit P7.

2           Mr. Cajamarca, can I ask you one question.  Is the

3   testimony contained in that declaration true and correct?

4           THE WITNESS:  Yes.

5           THE COURT:  Do you offer that as your direct testimony

6   in this matter as if you were testifying live as to all of the

7   matters contained in that declaration?

8           THE WITNESS:  Yes.

9           THE COURT:  Thank you very much.  I'm accepting

10  Plaintiff's Exhibit P7 as Mr. Cajamarca's direct testimony.

11           (Plaintiff's Exhibit P7 received in evidence)

12           THE COURT:  Let me turn now to cross-examination,

13  Mr. Strand.

14           MR. STRAND:  Thank you, your Honor.  I am going to use

15  the name Luis because I can't pronounce the last name.  I'm

16  very sorry.

17  CROSS-EXAMINATION

18  BY MR. STRAND:

19  Q.  Luis, you said you lived in Queens, correct?

20  A.  Yes.

21  Q.  Did you live in Queens in 2014 and 2015 when you were

22  working at the restaurant?

23  A.  Yes.

24  Q.  Woodside or Wood Haven?

25  A.  Woodside.

1   Q.  How did you get to work?

2   A.  By train.

3   Q.  Which train?

4   A.  The 7.

5          THE COURT:  Pardon me, counsel.  Can I ask a favor.

6   Would you mind please continuing your questioning from this

7   podium next to the witness stand, please.

8          MR. STRAND:  Sure.

9   Q.  7 train.  Which station did you get on at?

10  A.  46.

11  Q.  Where did you get off at?

12  A.  Queensborough Plaza and from there I would take the N or

13  the Q.

14  Q.  Queensborough Plaza and then N or Q?

15  A.  Yes.  All the way to 14.

16  Q.  You took the N or Q to 14th Street?

17  A.  To Union Square.

18  Q.  Union Square is on 14th Street.  We are good.

19  A.  Yes.

20  Q.  I got that.  You said you were paid part with a check,

21  right?

22  A.  Yes.

23  Q.  Do you have a bank to deposit that check or did you go to a

24  cashing place?

25  A.  I used to cash it.

1   Q.  You don't have a bank account?

2   A.  No.  I deposit it at my wife's bank.

3   Q.  Your wife does, but you don't.

4   A.  No.

5   Q.  So you have a wife.  You are married?

6   A.  I'm not married.  We live together.

7   Q.  You live together.  That's fine.  Did she live with you in

8   2014 and 2015?

9   A.  In 2014, '15, yes.

10  Q.  What's her name, by the way?

11  A.  Alicia, Alicia Hernandez.

12  Q.  Now, you said you took the 7 train.  What time would you

13  leave home to go to work at the restaurant?

14  A.  I don't remember exactly, but I would never be late to

15  work.

16  Q.  I didn't accuse you of that.  I want to clarify this.  It's

17  your testimony that you work the same schedule every week.  Is

18  that correct?

19  A.  Yes.

20  Q.  And when we say same schedule, that means the end times

21  were the same?

22  A.  Sometimes when there were people there I would stay a bit

23  later, but yes.

24  Q.  Later, but sometimes earlier as well, or just later?

25  A.  Later.

1   Q.  You never left earlier, but you would stay later sometimes?

2   A.  I never left earlier.

3   Q.  Let me just clarify that a little further.  Did the

4   restaurant sometimes close earlier, not that you left earlier,

5   like left the job earlier, but did the restaurant sometimes job

6   at maybe like 9 instead of 10?

7   A.  No.

8   Q.  Now, I want to ask now about an inconsistency in the

9   complaint.  I'm not accusing you of making an inconsistent

10  statement.

11          MR. KUMAR:  Your Honor, objection.  The complaint is

12  not verified in this action.  Mr. Cajamarca never swore to its

13  authenticity or the veracity of the allegations.

14          THE COURT:  Overruled.  You can proceed.

15  Q.  Azem Hasangjikaj fired you, correct?

16  A.  He called the chef, Segundo, saying Martino should go on

17  vacation, and then Martino told me that there was no business

18  and there was no more.

19          THE COURT:  Pardon.  Let me just note for the record.

20  Is this Mr. Hasangjikaj who has just joined us?

21          MR. STRAND:  Yes, your Honor.

22          THE COURT:  I will note that Mr. Hasangjikaj has

23  appeared.  Proceed.

24  Q.  Mr. Hasangjikaj fired you, correct?

25  A.  Yes.  He called me.  He said no more.

G6RMCAJ2                          Cajamarca - cross

1    Q.  Did you ever say that Segundo fired you?

2    A.  No.  He told me, not Segundo.

3              THE INTERPRETER:  Interpreter needs clarification.

4              Interpreter correction.

5    A.  Segundo told me that Martino said for me to go on vacation,

6    that there was no more work, and then I called him.  I called

7    and then he called me saying there was no more work, there was

8    no business.

9              THE COURT:  When you say he, are you referring to

10   Mr. Calle or Mr. Hasangjikaj?

11             THE WITNESS:  Martino.

12             THE COURT:  Thank you.

13             MR. STRAND:  Hasangjikaj, it's his middle name.

14   Q.  Was there a meal, a community meal of restaurant employees

15   from 4 p.m. to 5 p.m. where the employees could show up early

16   and eat dinner?  Did that happen?

17   A.  Yes.  We would eat together for about 15, 20 minutes, max.

18   Q.  You agree there is a meal.  You just say it was shorter.

19   A.  Yes.

20   Q.  It wasn't 60 minutes long.

21   A.  No.

22   Q.  And it started at 4?

23   A.  The meal?

24   Q.  Yeah.

25   A.  I don't remember exactly.

G6RMCAJ2                          Cajamarca - cross

1              MR. STRAND:  I have no more questions.

2              THE COURT:  Thank you.  Mr. Kumar, any redirect?

3              MR. KUMAR:  No redirect, your Honor.

4              THE COURT:  Thank you very much.

5              Thank you, Mr. Cajamarca.  You can step down.

6              (Witness excused)

7              THE COURT:  Mr. Kumar, do you have any additional

8       witnesses or testimony that you would like to present to the

9       Court in this matter?

10              MR. KUMAR:  No, your Honor.

11              THE COURT:  Counsel, I understand that the parties

12       have stipulated to the admission of all of the plaintiff's

13       exhibits as identified in the joint pretrial order that I

14       ordered last week.  Is that correct?

15              MR. KUMAR:  Yes, your Honor.

16              THE COURT:  Is that correct, Mr. Strand?

17              MR. STRAND:  Yes, your Honor.

18              THE COURT:  Mr. Kumar.

19              MR. KUMAR:  Plaintiff rests, your Honor.

20              THE COURT:  Thank you very much.

21              Mr. Strand.

22              MR. STRAND:  Your Honor, may I have a very brief

23       recess to discuss some of the direct testimony by affidavit

24       procedures with my client.

25              THE COURT:  Yes, you may.  We will take a seven-minute

1    recess.  Let's plan to resume at exactly 9:50.  Thank you very

2    much.

3              (Recess).

4              THE COURT:  Mr. Strand, please call your first

5    witness.

6              MR. STRAND:  Absolutely.  Defense calls Azem Martino

7    Hasangjikaj.

8              THE COURT:  Mr. Hasangjikaj, please come forward.

9     AZEM HASANGJIKAJ,

10        a defendant, called as a witness on his own behalf,

11        having been duly sworn, testified as follows:

12             THE COURT:  Please proceed.

13             MR. STRAND:  Your Honor, I am going to submit the

14   direct testimony affidavit, but I realize there is a typo in my

15   paragraph 9.  May I ask him a question to correct the typo?

16             THE COURT:  Please do that as part of the questioning

17   that you are about to do in order to authenticate the document.

18             MR. STRAND:  Sure.  Let the record reflect that I'm

19   showing the witness the direct testimony affidavit of Azem

20   Hasangjikaj.

21   DIRECT EXAMINATION

22   BY MR. STRAND:

23   Q.  Sir, do you recognize this?

24   A.  I'm sorry.

25   Q.  Do you recognize that document?

1    A.  Yes, I do.

2    Q.  Where do you recognize it from?

3    A.  From the last testimony.

4    Q.  From when I met with you and notarized?

5    A.  Yes.  That's correct.

6    Q.  Let me just ask, because there is a typo in paragraph 9.

7    It says shift when it should say lunch shift.  Can you describe

8    for the Court what were the plaintiff's shift hours?  For

9    lunch, what were his work hours, and for dinner?

10   A.  If someone worked for lunch, he would have worked from 12

11   to 3, approximately.  And then, you know, that break.  There is

12   nothing between 3 and 5.  They can go back at 4:00 and have a

13   lunch and that's their break time.  5:00 they would start to

14   work.  And the guy who worked through lunch, his shift will end

15   10 to make sure that they don't exceed it.  Make sure that is

16   their shift.  A lot of times I let them go early because there

17   is no business, but what it means.

18   Q.  I just want to clarify because it said he when he worked a

19   shift and it was supposed to say when he worked a lunch shift.

20   I just needed to fix that.

21            Does this affidavit constitute your direct testimony

22   in this case?

23   A.  Repeat one more time.  Sorry.

24   Q.  Does this document constitute your testimony in this case?

25   A.  Yes, it does.

1              MR. STRAND:  Thank you.

2              THE COURT:  Thank you.  Let me ask you two brief

3    questions, if I can, Mr. Hasangjikaj.  First, can you please

4    look at the last page of the document that you're looking at

5    right now.  Please look at the last page of the document that

6    you are looking at.  Is that your signature on the last page?

7              THE WITNESS:  Yes.

8              THE COURT:  Is all of the information contained in

9    that document true and correct?

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  You understand that you are testifying

12   under oath here today in this proceeding.  Do you affirm that

13   the information contained in that affidavit constitutes your

14   testimony in court here today as if it were delivered live

15   before me?

16             THE WITNESS:  Yes, your Honor.

17             THE COURT:  Thank you very much.  I am going to

18   propose to mark Mr. Hasangjikaj's affidavit as Defendant's

19   Exhibit 2, and I will accept it as Mr. Hasangjikaj's direct

20   testimony.  I understand that the testimony is intended to be

21   modified such that paragraph 9 would read in the second line,

22   workday lunch shift rather than simply workday shift.  Thank

23   you very much.

24             (Defendant's Exhibit 2 received in evidence)

25             THE COURT:  Mr. Kumar, please proceed.

1             MR. KUMAR:  Your Honor, during the pretrial conference

2    the defense counsel was going to extend his direct so your

3    Honor could get a foundation for Defendant's Exhibit A.

4             THE COURT:  Thank you, Mr. Kumar, for reminding me of

5    that.  I appreciate that.

6             Mr. Strand, would you please come forward.

7             MR. STRAND:  Yeah, sure.  I forgot, too.  Thank you,

8    your Honor.

9             Let the record reflect I'm showing the witness the

10   first page of the defense first exhibit, or Exhibit A, however

11   we marked it.

12   Q.  Do you recognize this document?

13   A.  Yes.

14   Q.  Where do you recognize it from?

15   A.  Really, the guy who works for me, he marks the shifts as

16   they scheduled them to work.

17            MR. STRAND:  Let the record reflect I'm now turning to

18   the second page, employee detail for Yerina Restaurant Corp.

19   Q.  Do you recognize this?

20   A.  Yes.

21   Q.  Where do you recognize it from?

22   A.  From my records.

23            MR. STRAND:  Your Honor, I'd like to offer in evidence

24   Defense Exhibit 1 the payroll records of the restaurant.

25            THE COURT:  Thank you.  I understand that there is a

 1    stipulation to this.  Mr. Kumar.

 2              MR. KUMAR:  Pardon me, your Honor.  I didn't hear you.

 3              THE COURT:  There is a stipulation as to this.  Is

 4    that correct, Mr. Kumar?

 5              MR. KUMAR:  There is, your Honor.

 6              THE COURT:  Thank you.  It's accepted into evidence.

 7              (Defendant's Exhibit 1 received in evidence)

 8              THE COURT:  You can step down, Mr. Strand, unless you

 9    have additional questions.

10              Mr. Hasangjikaj, the first page that was just pointed

11    to by Mr. Strand has dates under weekly kitchen.  Can you tell

12    me what year these records refer to?

13              THE WITNESS:  I believe 2014, I think.

14              THE COURT:  Do you know that to be true?

15              THE WITNESS:  I am not sure.

16              THE COURT:  And the remainder of Exhibit A contains a

17    number of records which are described as employee details for

18    Yerina Restaurant Corp.  Can you tell me what the system is

19    that's used to produce these records?

20              THE WITNESS:  Make sure we mark people as we schedule

21    them to work and mostly we work dinner.  And we mark them as

22    they come.  Like if they show up at 12:00, we put them lunch

23    shift and then they have a break.  Then they work until 9:00.

24    Depends on business.  Mostly no more than 10.  And they go

25    home.

1                THE COURT:  How are these records produced?  What is

2        the system that is used for that purpose?

3                THE WITNESS:  I am not sure I understand.

4                THE COURT:  Sir, I'm pointing you to a set of

5        documents that have been identified to me as your payroll

6        records.  I'm asking you what the system is, the computerized

7        system that is used to produce these records.

8                THE WITNESS:  We actually manually did it until now.

9        We have PI system.  We have a computer system.

10               THE COURT:  Thank you.  Someone manually inputs the

11       number of hours into this report, is that correct?

12               THE WITNESS:  Yes, your Honor.

13               THE COURT:  Thank you.

14               Please proceed, Mr. Kumar.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

G6RACAJ3ps                          Hasangjikaj - cross

1              MR. KUMAR:  Thank you, your Honor.

2              THE COURT:  You can proceed.

3              MR. KUMAR:  Thank you, your Honor.

4    CROSS EXAMINATION

5    BY MR. KUMAR:

6    Q.  Sir, you are the owner of Yerina Restaurant Corp.?

7    A.  Yes.

8    Q.  Yerina Restaurant Corp. owns a restaurant called Arte

9    Restaurant?

10   A.  Yes, I am.

11   Q.  Arte is located in Manhattan?

12   A.  Yes, it is.

13   Q.  Arte Restaurant is an Italian restaurant?

14   A.  Yes.

15   Q.  You've owned Arte Restaurant for over 20 years?

16   A.  Yes.

17   Q.  Closer to 30 years, correct?

18   A.  No, 23 years.

19   Q.  OK, 23 years.  And for the past three years, you've hired

20   all of the employees that have worked at Arte Restaurant?

21   A.  Most likely, yes.

22   Q.  Sir, did you hire Mr. Segundo Calle to work for you?

23   A.  Did I hire?

24   Q.  Mr. Segundo Calle to work for you.

25   A.  Yes, I did.

1   Q.  Mr. Calle is the head cook at Arte Restaurant, correct?

2   A.  Yes.

3   Q.  Does Mr. Calle still work for you?

4   A.  Yes.

5   Q.  Mr. Calle lives in Queens, correct?

6   A.  Yes.

7   Q.  Do you know if Mr. Calle is ill today?

8           Is he ill today?

9           MR. STRAND:  I'm going to object to that on relevance

10  grounds.

11          THE COURT:  Overruled.

12  A.  I don't know.  I have no idea whether he is ill today.  I,

13  I woke up at 6 o'clock in the morning, so I don't know if he's

14  ill.  He's not going to be here until 4 o'clock.

15  Q.  OK.  That's a fair answer.

16          Mr. Calle has worked for you for over ten years?

17  A.  Yes.  20 years.

18  Q.  Mr. Calle is still your employee, correct?

19  A.  Yes.

20  Q.  As head cook, he's in charge of the kitchen; is that

21  correct?

22  A.  Could you repeat that again?

23  Q.  As head cook, Mr. Calle is in charge of the kitchen?

24  A.  Yes, he is.

25  Q.  You pay Mr. Calle on a salary basis?

1    A.  Yes.

2    Q.  You pay him on a salary basis because, in part because he's

3    an independent contractor?

4    A.  Yes.

5    Q.  Because you pay Mr. Calle -- my apologies.

6         Because Mr. Calle is paid on a salary basis, he's

7    given a little more freedom as to when he is allowed to come in

8    and when he's allowed to leave; is that correct?

9    A.  He comes when he wants to come.  You know, he really

10   doesn't have a schedule to come, but he -- yeah, he comes --

11   he's in charge.

12   Q.  So that's a yes.

13   A.  Yes.

14   Q.  If you would ask Mr. Calle to come in and testify today, he

15   would have come in to testify; is that correct?

16   A.  He would come, where?

17   Q.  To testify here today, if you had asked?

18   A.  Well, he, he didn't really.  I didn't ask, but he would

19   probably.

20   Q.  And in court today?

21   A.  I did not ask him, but if I did, I'm sure he would have

22   come, I believe.

23   Q.  You manage the day-to-day operations of Arte Restaurant; is

24   that correct?

25   A.  Yes.

G6RACAJ3ps                    Hasangjikaj - cross

1   Q.  You work every day?

2   A.  Yes.

3   Q.  Seven days a week.

4   A.  Seven days.

5   Q.  And you start your day at 4 p.m.

6   A.  Yes.

7   Q.  Arte Restaurant opens before 4 p.m.; is that correct?

8   A.  Yes.  Open at noon.  Opens five days at noon.

9   Q.  And you let someone else open the restaurant for you,

10  because you don't get there until 4; is that correct?

11  A.  My daughter opens.

12  Q.  I'm sorry.  Can you say that again?

13  A.  My daughter operates through the lunch hours.

14  Q.  And then someone else also has keys to open the restaurant;

15  is that correct?

16  A.  Well, she has the keys.

17  Q.  What about Mr. Vilson Brulha, B-r-u-l-h-a, does he have

18  keys to open the restaurant?

19  A.  Vilson has the keys, but, you know, he comes later because,

20  you know, she opens the restaurant.  He doesn't have to come

21  early.

22  Q.  Can you spell your daughter's name, please.

23  A.  Villoca, V-i-l-l-o-c-a.

24  Q.  And as you said before, your daughter runs things while

25  you're not there.  She runs the lunch shift.

G6RACAJ3ps                    Hasangjikaj - cross

1    A.  Yes, she does.

2    Q.  And she keeps an eye on things because you're not there; is

3    that correct?

4    A.  She is -- I'm sorry, because, you know, my ears are -- I'm

5    not hearing very well, so sometime I'm asking you to repeat.

6    Q.  If you need me to repeat any question, just ask and I'll do

7    it.  OK?

8    A.  This last question.

9    Q.  She keeps an eye on things for you, because she runs the

10   lunch shift; is that correct?

11   A.  Yeah.  She's there.

12   Q.  And she keeps track of when employees come in and when they

13   leave.  Is that correct?

14   A.  Yes.

15   Q.  And your daughter, Villoca, she currently lives with you;

16   is that correct?

17   A.  She lives with me.

18   Q.  If you asked her to come in to testify today, would she

19   have come in?

20   A.  She might.  She have to.

21   Q.  If you had asked her.

22   A.  Yes, I'm sure she would.

23   Q.  Mr. Brulha is the head waiter at Arte Restaurant; is that

24   correct?

25   A.  Yes.

G6RACAJ3ps                    Hasangjikaj - cross

1  Q.  He has worked for you for over ten years?

2  A.  Yes.

3  Q.  He comes in during the lunch shift as well?

4  A.  Yes, he does.

5  Q.  And part of his duties is to train the wait staff; is that

6  correct?

7  A.  Mostly, yes.

8  Q.  And he also has to make the schedule for the kitchen staff.

9  A.  Yes, he does.

10 Q.  Since he's there earlier than you, he also helps keep track

11 of when employees come in for lunch shift; is that correct?

12 A.  Yes.

13 Q.  Mr. Brulha still works for you?

14 A.  Yes, he does.

15 Q.  Do you know what county he lives in?

16 A.  Well, now I believe he lives in Manhattan.  He used to live

17 in Westchester.  Connecticut.

18 Q.  And if you had asked Mr. Brulha to come in and testify, he

19 would have, correct?

20 A.  He would, yes.

21 Q.  The plaintiff in this action, he was employed as a pasta

22 man; is that correct?

23 A.  Repeat that again?

24 Q.  Mr. Cajamarca, Luis, he was employed as a pasta man, right?

25 A.  As a cook.

1   Q.  A cook or pasta man?

2   A.  Cook.

3   Q.  OK.

4   A.  How you define, you mind if I say?  Those guys are not

5   lawyers; they're cooks, they cook, in general cook, can make

6   pasta, can make veal, can make salad.  It's a cook.  That's

7   what we consider him, as a cook.  His title is pasta man.

8   Q.  Because of his duty -- because he's a cook or pasta man,

9   his general duties include making pasta, and he also helps cook

10  meats and makes salads; is that correct?

11  A.  It's correct, but most of the time I have a salad man, you

12  know, so everybody has his own, you know, space there.

13  Q.  And Mr. Cajamarca's salary was $700 per week net; is that

14  correct?

15  A.  Yes.

16  Q.  And he was paid $700 every week.

17  A.  Yes.

18  Q.  You consider him an independent contractor; is that

19  correct?

20  A.  Yes.  That's what deal was when he came.  He didn't want to

21  work by --

22  Q.  Yes or no, sir.  You think of him as an independent

23  contractor, correct?

24  A.  Independent, yes.

25  Q.  So you didn't keep track of his actual time in; is that

1    correct?

2    A.   Yes.

3    Q.   And you didn't keep track of when he left; is that correct?

4    A.   I kept track, even though he was not employed, because he

5    has his time in, he left whether he wanted or not, so he was

6    not someone who stay longer.

7    Q.   Did you keep a written record of when Mr. Cajamarca left

8    work?

9    A.   When he left, he, I always knew his hours there.

10   Q.   Sir, did you keep a written record of when Mr. Cajamarca

11   left work?

12   A.   Sir, he had a schedule --

13   Q.   Yes or no, sir?

14   A.   I have to sense this, it's not -- he has a schedule, so it

15   would say from 5 to 10, and, you know, he left at 9:30.  So we

16   didn't really, you know, take anything off from him, just let

17   him, you know, go.  That's what I said.

18            MR. KUMAR:  Your Honor, move to strike the response of

19   the witness.

20            THE COURT:  Thank you.  Denied.  You can ask a

21   question.

22   Q.   Sir --

23   A.   This --

24   Q.   You have a written record of when he left?

25   A.   No.

1   Q.  Thank you.  Was there any fluctuation from week to week

2   concerning Mr. Cajamarca's pay?

3   A.  No.

4   Q.  You state in your direct testimony that work schedules for

5   employees are done by meal shift, lunch and dinner.  Is that

6   correct?

7   A.  Yes.

8   Q.  Was this true for Mr. Cajamarca as well?

9   A.  The schedule, yes.

10  Q.  And if an employee worked a lunch, he always worked a

11  denar; is that correct?

12  A.  Not all of them.  They have like one day, two -- one day,

13  two days, depends.  Not, you know, not steady, not every, every

14  day.

15  Q.  So if he worked a lunch, he could have just worked lunch;

16  is that your testimony?

17  A.  When he worked the lunch, he worked 12 to 3, and then he

18  had a break.  Well, went, went to sleep downstairs, and then he

19  came back 5 o'clock.  Once he came to eat, and then he went

20  back and relax until 5 o'clock.  At 5 o'clock, the dinner

21  starts, at our restaurant normally, whether they start or not,

22  but 5 o'clock, some people start coming, and then they are, you

23  know, they come back to work.

24  Q.  Let's answer the question that was asked.  If Mr. Cajamarca

25  worked a lunch, could he go home just -- and work just lunch

G6RACAJ3ps                     Hasangjikaj - cross

1   that day, or did he have to come back and work dinner?

2   A.  He would have to work dinner.  He would have to come back

3   for dinner.

4   Q.  According to your testimony, Mr. Cajamarca worked only one

5   lunch and five dinners; is that correct?

6   A.  Mostly, yes.

7   Q.  That means he only worked five days a week?

8   A.  Sometimes yes.  Six shifts, sometimes -- we mark the shifts

9   there, sometimes yes.  Six shifts, sometimes five shifts,

10  depends.  Depends on business.

11  Q.  Sir, I'd like to turn you to Defendant's Exhibit A.  Do you

12  still have it with you?  Sir, that's Defendant Exhibit 2.  I

13  believe you're looking at your direct testimony.  Is that

14  correct?

15  A.  Exhibit A.

16  Q.  Right.

17  A.  Yes.

18          MR. KUMAR:  Your Honor, may I approach the witness?

19          THE COURT:  Please do.

20  Q.  Here, this is Defendant's A.

21          Sir, can you turn to the first page of Defendant's

22  Exhibit A, the page that has four grids on it.  Are you looking

23  at it?

24  A.  Yes, sir.

25  Q.  The page after the one that you're looking at, it has a

1    weekly schedule with four grids.  Is that correct?

2    A.  Yes.

3    Q.  The top of each grid says "weekly kitchen"?

4    A.  Yes.

5    Q.  There are names on the left-hand column?

6    A.  Yes.

7    Q.  Is Mr. Cajamarca's name listed anywhere on that document?

8    A.  It's not, if it not -- was in the past.  This was current,

9    you know, it was this year, this, you know.  He was -- they

10   were all, but he's not here because this is long, long gone,

11   it's over a year.

12   Q.  I'm sorry, sir.  Do you know what year the --

13   A.  He is not --

14   Q.  -- that sheet comes from?

15   A.  2016.

16   Q.  OK.  So the first page of Exhibit A, where it says "weekly

17   kitchen," is from this year, 2016; is that correct?

18   A.  Yes.

19   Q.  Now, next to each employee's name, there is either a check

20   or an X.  Is that correct?

21   A.  Yes.

22   Q.  Anywhere on the sheet, does it show the precise time any of

23   these employees arrived to work?

24   A.  If they didn't arrived, mostly we will mark them off.

25   Q.  Does it have a time on that sheet?

```
 1   A.  Say again?

 2   Q.  Is there a time on that sheet, sir?

 3   A.  It's an X when it doesn't show up.

 4   Q.  So there's no time.

 5   A.  No.

 6   Q.  Anywhere on this sheet, does it show the precise time any

 7   of these employees left work?

 8   A.  In what sense you mean "left work"?

 9   Q.  Does it have a time that shows when -- that corresponds to

10   when any employee left work?

11   A.  They have a schedule.  That's their time.  They know what

12   time to work, what time they work, you know.

13   Q.  Is there a time on that sheet that shows when an employee

14   left work?

15   A.  There is not, but it's known in the restaurant, 12 to 3, 5

16   to 10.

17   Q.  Right.  So you said that the shifts are split into lunch

18   and dinner.  Is that correct?

19   A.  Some shifts, when they worked lunch and dinner, they go

20   early.  So the shifts are 12 to 3 and 5 to 10.

21   Q.  OK.  Anywhere on that sheet, does it say lunch shift,

22   dinner shift, or anything like that?

23   A.  (Pause)  Doesn't say here.  I don't see -- it doesn't say

24   here.  It doesn't specify here, but, you know, there's another

25   sheet they have, they have, you know, lunch and dinner when,
```

1   you know, it's a different shift.

2   Q.  So using this sheet and this sheet alone, can you tell me

3   when an employee worked a lunch shift, when an employee worked

4   a dinner shift, or when an employee worked a lunch and a dinner

5   shift?

6   A.  Just have three guys working for lunch, you know, and

7   different schedule, you know, like they worked two days and

8   they have a schedule there, which is written out of places two,

9   and the schedule is like, for example, Luis works today and he

10  knows, you know, not work or there will be a schedule here if

11  he worked today and he has to work tomorrow again.  So he has

12  one day.  And then he -- or he has only dinners to work.  So

13  they all have a schedule like that, because we don't have a

14  lunch business.  Mostly we go for friend or something but not,

15  you know, much lunch business.

16  Q.  Sir, using that sheet and that sheet alone, can you tell me

17  whether an employee worked a lunch shift?

18  A.  Those are just, it just --

19  Q.  Using that sheet alone, can you tell whether an employee

20  worked a lunch shift?

21  A.  I -- if can tell you -- no, you know, I know when they

22  worked.  I can tell on the sheet, in the sheet, where they

23  worked.

24  Q.  Using just that record, can you tell me whether an employee

25  worked a dinner shift?

1    A.  No.  No, because it's just a schedule of the days.

2    Q.  And in your direct testimony, you said that this is not how

3    the employee time records are usually kept, correct?

4    A.  No -- yes, I did.  Say no.

5    Q.  Was that the same for 2013 through 2015?

6    A.  I, I don't think so, but I don't have it on me, I don't

7    have, so...

8    Q.  You said in your direct testimony that the records that you

9    usually kept have exact numbers on them.  Is that correct?

10   A.  Yeah.  It's got lunch and dinner, so who worked lunch, who

11   worked dinner, so everything specifies where, you know, just to

12   let them know who is on schedule to work for next day.  That's

13   all.

14   Q.  Now, by "exact numbers," do you mean the schedule of when

15   they're supposed to come in, or do you mean the exact time they

16   came in?

17   A.  We know exact time, so if they come straight at 12 o'clock

18   and they start from 5 another shift.

19   Q.  OK.  The records that are kept now, are they a schedule, or

20   if an employee came in at 12:02, is that marked down?

21   A.  They are all told and they are all -- have agreement with

22   me when they come that they -- their schedule, they ask for it,

23   you know, they ask for their time, like Mr. Cajamarca, well, he

24   asked for his, what hours he's going to work, and he asked for

25   his pay.  He didn't want to work by hours, he said I want to

1     get paid flat, I want to take $700, half and half.  So $700

2     after the taxes he got paid, Mr. Cajamarca.

3            Waste of my time because it's a whole, you know,

4     restaurant industry know that Mr. Cajamarca, he sues every

5     restaurant.  And I'm about, you know, losing the business, you

6     know, losing the business, that I don't have enough business

7     and Mr. Cajamarca comes and puts me in the court for -- he

8     getting his full pay and his arrogance towards the workers and

9     me and everybody that he refused to work.  That's what I want

10    to say.

11           I'm really, you know, tell you -- you ask me how many

12    times and I don't change, you know.  I can look at it a million

13    times and I will say the same.  Because it's a restaurant.

14    It's not a, you know, law firm.  It's -- they know exactly.

15    And they have -- they know more rights than I do.  And they ask

16    for every single thing, and they get more than they ask.  He

17    specifically came to me and said, I do not want to work by

18    hours, I want to make $700 after taxes, flat.  Whether he works

19    odd hours or he doesn't work, he goes home at 9 o'clock, 8

20    o'clock, whole summer at 8 o'clock.  Why doesn't he pay me back

21    for this.

22           MR. KUMAR:  Move to strike, your Honor.

23           THE COURT:  Denied.

24    Q.  Sir, is it fair to state that the top sheet where it says

25    "weekly, weekly kitchen," isn't an accurate representation of

G6RACAJ3ps                    Hasangjikaj – cross

1    how you currently keep your records?

2    A.   This is only for Vilson to know who's coming that day, but

3    they all have, you know, they all have a different agreement

4    with the chefs where they work, they all know they have in the

5    kitchen, place there, for example, Segundo works lunch today

6    and then he goes, you know, break, and he comes back at 5

7    o'clock.  All of them have a break.  They don't, you know, they

8    have moderate.  They have from 5 to -- you know, 3 to 5, mostly

9    3 to 5, you know, so they, sometimes they say 4 to 5 or 3 to 5,

10   there's nobody there.

11          And it specifies there, it's a lunch shift, dinner

12   shift.  Yeah.  Lunch shift is only two and a half, three hours,

13   and then dinner shift starts 5 to 10.

14   Q.   So you keep your records differently than what's -- the

15   first --

16   A.   Yes.  This was just -- this was the schedule just for him

17   to know who is -- who works there, you know.

18   Q.   OK.  Can you turn to the next page, please, sir Defendant's

19   Exhibit A.

20   A.   Yes.  What do you mean?

21   Q.   Just turn to the next page.  This document begins "payroll

22   records for Arte restaurant for the years 2014 and 2015."  Is

23   that correct?

24   A.   Yes.

25   Q.   On the top right-hand corner of that page, you should see a

G6RACAJ3ps                          Hasangjikaj – cross

1   sticker this says "Plaintiff's Exhibit" and the number 2

2   handwritten.

3   A.  Yes.

4   Q.  Are you on that page?

5   A.  Yes.

6   Q.  On the top page, there are written headers.  Is that

7   correct?

8   A.  Yes.

9   Q.  "Date, STA, regular hours, or REG HRS gross," etc.?

10  A.  Yes.

11  Q.  Toward the bottom of the page, is there a line that says

12  "Cajamarca, Luis R."?

13  A.  Yes.

14  Q.  Underneath that it says "QTR 1"?  Is that correct?

15  A.  I don't see that, no.

16          MR. KUMAR:  Your Honor, may I just --

17          THE COURT:  Please do.

18  A.  I have it.

19  Q.  You do?  OK.  And under "QTR 1" there are some weekly

20  dates.  Is that correct?

21  A.  Yes.

22  Q.  Next to each of the weekly dates it says the number 40.  Is

23  that correct?

24  A.  Yes.

25  Q.  That number corresponds to the column "REG HRS"; is that

1   correct?

2   A.  Yes.

3   Q.  The number 40 is just a placeholder, right?

4   A.  Yes.  Correct.  Because of -- I can explain that, how,

5   because he -- he actually had the -- he had the schedule that

6   makes those hours approximately.  He scheduled himself in that,

7   as far as, you know, independent contractor.  He asked for the

8   time and the time that he's going to work and that's it.  He,

9   you know, he is -- why they wrote this is, is a record of his

10  hours.  This is maximum hours.  Never reach that, but we paid

11  him because this was the agreement.  We needed him to pay him

12  $700.

13  Q.  And that's 40 regular hours, though.

14  A.  Yes, 40 regular hours for him.

15  Q.  Let me finish the question, sir.

16          That was just used to simplify the payroll process,

17  right?

18  A.  Yes.

19  Q.  All right.  So the number 40, that's not the number of

20  hours that he worked.  Whether it's above or below I'm not

21  asking.  Did he work 40 hours each and every week?

22  A.  He never exceeded, never exceeded.

23  Q.  Did he work exactly 40?

24  A.  Most likely not.  It could be, but that's what we have.

25          (Pause)

G6RACAJ3ps                    Hasangjikaj - cross

1   A.  He never exceeded the 40 hours, but we did pay him because

2   of the agreement of -- between me and him, you know.  It was

3   agreement that he gets a salary and he gets $700, which is,

4   which is, I believe, it's legal, normal things.  He wants to

5   get, you know, $700 clean after taxes, and therefore he got the

6   money.  I paid him on based on our agreement.

7   Q.  So just so I have it clear, that 40 hours is just a

8   placeholder, correct?

9           MR. STRAND:  Objection, asked and answered.

10          THE COURT:  You can answer the question.

11  A.  In his case, 40 hours doesn't even have to be reason

12  because, I mean, his hours, because he was independent

13  contractor.  He did not work by hour.  He refused to work by

14  hours.  He wanted to get paid.  If he got by us, he would not

15  reach the amount of money that he got.  So this is, he said,

16  I'm a cook and I want to get paid this much.  Therefore I paid

17  him based to he -- his demand, to make him happy.  Never

18  complained before that.  Never said that except when he was

19  fired.

20  Q.  Now, next to where it says "40 hours," close by, do you see

21  the header that says "gross," g-r-o-s-s?

22  A.  It's next to the 40 hours?

23  Q.  On the top of the page, there should be a column.  Close by

24  it says "gross."

25  A.  Yes.

1   Q.  OK.  "Gross" means gross wages, correct?

2   A.  Yes.

3   Q.  Now go back down to Luis Cajamarca.

4   A.  Yes.

5   Q.  For the week ending May 8, it says Mr. Cajamarca was paid

6   $450.  Correct?

7   A.  Correct.

8   Q.  Did Mr. Cajamarca gross $450 that week?

9   A.  Well, he -- probably.  He probably didn't work all the

10  days.  He probably worked last days.  He didn't -- he didn't

11  work -- he didn't work six days, five days.  He didn't work

12  four days.  He probably worked three days.  If he was paid like

13  that, isn't based to this, you know, amount of work, days he

14  worked.

15  Q.  Let's go down to May 15.  He should have worked his full

16  shift by then.  It's the next week.  Is that correct?

17  A.  I don't have an answer for that.  I really doesn't know.

18  It's long past, and it will not be paid last if he worked full

19  days.  That's my answer.

20  Q.  At any point did Mr. Cajamarca only gross $450 a week?

21  A.  No.

22  Q.  He always got paid, he always netted $700?

23  A.  There is a difference paid.  Remember, he got 1099 and this

24  one, so I'm sure the difference was paid in the, you know,

25  1099.

G6RACAJ3ps                    Hasangjikaj - cross

Q.  So using just those records, can you tell me how much
Mr. Cajamarca got paid in 2014?  No extraneous information,
just those records.

A.  He got paid $700.

Q.  Does it say $700 on those records, or more?

A.  We have the record.  We gave you the record between, you
know, the 1099 and the check that he got.

Q.  Yes or no, sir, using just those records, can you tell me
how much Mr. Cajamarca got paid?

A.  What he has here, he has another check -- he has a -- we
provided you and my attorney, we provided with information how
he was paid.

Q.  Using just those records, can you tell me how much
Mr. Cajamarca got paid, not anything else, just what's in your
hand?

A.  I know, but what you trying to do, you trying to frame me
on the question here.  I am telling you that you have a full
record.  The reason from you, that you said that he was paid
$700.  And last he worked last days, he was paid last.  So it
doesn't matter -- let's say he was paid 450.  That means the
time that he worked.  He was paid based on the days that he
worked.

Q.  Can you tell me using those records whether or not he was
paid 450 more or less?

A.  I see here 450.

1    Q.  But he was paid more.

2    A.  He would take more.

3    Q.  He would take more or he was paid more?

4    A.  I'm not sure here, because I can't answer something that I

5    don't have on the records.  I don't remember.  I have to go

6    back and check on this because I don't remember what he was

7    paid that week.  You're asking me two years later, and I

8    don't -- I don't really know.  I don't want to just make, make

9    up a story and say I paid him this much or that much.  I don't

10   know.  But based on the evidence, whatever it says there, and

11   it's paid and based to the time that he worked, meaning the

12   days he worked, and he will come and tell me, he will come and

13   tell me.  He comes and tell me, I worked this much.  If he

14   worked five days, he would not walk home without getting paid.

15   Normal.

16   Q.  You pay taxes on the check amount that you gave

17   Mr. Cajamarca; is that correct?

18   A.  Yes.

19   Q.  Are you responsible for paying the payroll taxes for Arte

20   Restaurant?

21   A.  No.  It's Maria.  Maria Dinu.

22   Q.  And Maria Dinu is your bookkeeper?

23   A.  Yes.

24   Q.  Do you know if the payroll taxes were paid on the cash

25   amounts paid to Mr. Cajamarca?

G6RACAJ3ps                    Hasangjikaj - cross

1              MR. STRAND:  Objection.  What's the relevance of that

2    question?

3              THE COURT:  Overruled.

4    Q.  Does the --

5              THE COURT:  Overruled.  You can answer that question.

6    A.  I can then answer because I know they were paid, yes.

7    Q.  So you paid payroll taxes on --

8    A.  Yes.  We sent to him and we sent to the government.

9    Q.  Sir, can you look at the affidavit that constitutes your

10   direct testimony.  Paragraph 3, the first sentence is, "The

11   restaurant is open from 12 p.m. to 10 p.m. Monday through

12   Thursday, from 12 p.m. to 11 p.m. on Friday, from 5 p.m. to 11

13   p.m. on Saturday, and from 5 p.m. to 10 p.m. on Sunday."  Did I

14   read that correctly?

15   A.  Yes.

16   Q.  Is that paragraph correct?

17   A.  Yes.

18   Q.  Were those the hours for Arte Restaurant in 2014?

19   A.  Yes.

20   Q.  Were those the hours for Arte Restaurant in 2015?

21   A.  Yes.

22   Q.  Have you ever told anyone that Arte Restaurant was open

23   later than what you put in your direct testimony?

24   A.  No.

25   Q.  Had you ever advertised that Arte Restaurant is open later

1   than what's in your direct testimony?

2   A.  Not that I know, no, definitely.

3   Q.  And in the last three years, that has been the schedule for

4   the restaurant.

5   A.  Yes.

6   Q.  In the last three years, you haven't advertised that Arte

7   Restaurant is opened past those hours.

8   A.  In last 15 years I haven't advertised.

9   Q.  Not in the newspaper?

10  A.  No.

11  Q.  Not on the radio?

12  A.  No.

13  Q.  Not on Facebook?

14  A.  I don't have Facebook.  I don't know, you know, what people

15  do on Facebook, but not me.  I did not advertise that, no.

16  Q.  Do you know if Arte Restaurant advertises on Facebook?

17  A.  I don't go on Facebook that much.  I'm an old-fashioned guy

18  as far as these things.  I don't go, to be honest with you, I

19  don't go on Facebook.  I don't know what they do with Facebook.

20  I mean, I'm there 23 years.  I believe I do right things.  I

21  have relation with the guests that, they come in the

22  restaurant.  And I, I don't advertise -- don't advertise -- I

23  don't put on Facebook.  What the kids do on Facebook, I mean,

24  they can say that they work 24 hours.  I don't know.

25  Q.  What about Yelp?  Have you ever heard of the website Yelp?

G6RACAJ3ps                          Hasangjikaj - cross

1   Do you advertise on Yelp?

2   A.   Not me.

3   Q.   Is there any document that might change your testimony

4   about whether or not Arte Restaurant advertises on Yelp or

5   Facebook?

6   A.   I mean, there is people out there are that are their

7   followers and they can write whatever they want and they can

8   put the stuff.  But in my, you know, in my schedule, that's

9   what the hours are and that's what the time is, and, you know,

10  it doesn't mean we stay until then if there's no business.  But

11  those are the hours that we, you know, prepare to, you know, be

12  open.

13  Q.   If I showed you the Arte Restaurant Facebook page, do you

14  think you would recognize it?

15  A.   Would I recognize?

16  Q.   The Arte Restaurant Facebook page?

17  A.   I don't even know if it has one, to be honest with you.

18  Q.   What about the Arte Restaurant Yelp page?  If I showed it

19  to you, do you think you would recognize it?

20  A.   Maybe the workers do.  I don't know.  I'm sure I would

21  recognize, but I, I don't have to see it, because this is

22  definite and this is proof, Arte Restaurant has been open those

23  hours that I'm saying and no longer hours.

24          MR. KUMAR:  Your Honor, may I approach the witness?

25          THE COURT:  Please do.

1           MR. KUMAR:  Let the record reflect I'm handing --

2           THE COURT:  Show it to Mr. Strand.  Also provide a

3    copy to the Court if you have one.

4           MR. KUMAR:  Yes, your Honor.

5           MR. STRAND:  I object to the use of all these

6    documents, as they were not included in the joint pretrial

7    order.

8           THE COURT:  Thank you.  Overruled.  There is no

9    question pending.  Proceed.

10   Q.  I'm showing you two documents, handing them to you.

11          THE COURT:  Are those marked for identification

12   purposes, counsel?

13          MR. KUMAR:  Yes, your Honor.

14          THE COURT:  Thank you.  Sir, I understand, Mr. Kumar,

15   that you have shown the witness that are marked as Plaintiff's

16   Exhibits P8 and P9 for identification purposes.  Is that

17   correct?

18          MR. KUMAR:  That is, your Honor.

19          THE COURT:  Thank you.

20          THE WITNESS:  I can answer for this.

21          MR. STRAND:  Which one are you marking as P8, your

22   Honor?

23          THE WITNESS:  Just look at it closer.

24          MR. KUMAR:  P8 is Facebook.  P9 is Yelp.

25          THE WITNESS:  Your Honor, may I answer to this?

1              THE COURT:  There's no question pending.

2              MR. KUMAR:  There's no question.

3    Q.  Sir, I'm handing you, I handed you what has been marked as

4    Plaintiff's P8 and Plaintiff's P9.  P8 --

5    A.  This is aside from what you shown me from Internet.  Go

6    ahead.

7    Q.  Sir, on the bottom of P8, this document here --

8    A.  The first page?

9    Q.  Yes, sir.  Does it say "Arte Restaurant" in the top

10   left-hand corner?

11   A.  Yes.

12   Q.  And on the bottom, is there a web address that starts with

13   www.Facebook.com?

14   A.  Yeah, I see that.

15           This makes no sense to me.

16   Q.  In the middle of the page is there a map?

17   A.  Yes.

18   Q.  And next to the map, is there an address?

19           Is there an address next to the map?

20   A.  Hard to see.

21           Yes.

22   Q.  And that address is 21 East 9th Street --

23   A.  Yes.

24   Q.  -- New York, New York?

25   A.  Yes.

1   Q.  Is that the address of Arte Restaurant?

2   A.  Yes.

3   Q.  And the number below the address, (212) 473-0077?

4   A.  Yes.

5   Q.  Is that the phone number for Arte Restaurant?

6   A.  Yes.

7   Q.  Does Arte Restaurant have a Facebook page?

8   A.  I believe, kids do, but that doesn't, you know, doesn't

9   answer your question to this because this absolute -- we never

10  open at 4 o'clock.  It doesn't match with that.  And even

11  though if -- whatever they say, that's a Facebook page, which

12  really doesn't comply with anything that we, we really do.  So

13  people can say we open 24 hours, again, they can say.  But this

14  is not accurate.  It says we work Saturday 4 to 12.  It's

15  not -- we never open at 4 o'clock, to begin with.  We never,

16  you know, even though people are scheduled, like I mentioned to

17  you, scheduled to work, the ones that work early, they go, you

18  know, they go the latest 9:30, 10 o'clock home.  And the ones

19  they come at 5 o'clock, 5:30, they stay till closing.  So

20  closing never, never past 10, 10:30, 11 o'clock max.  You know,

21  if closing mean by cleaning and leave the restaurant.  The only

22  guy who stays there the latest is me.

23  Q.  Can you turn to the second page of what's been marked as

24  Plaintiff's P8 for identification.  You mentioned earlier next

25  to where it says "hours," does it say Monday through Friday 12

1    p.m. to 11 p.m.?  Yes or no.

2    A.  No.

3    Q.  What does it say?

4    A.  It's 12 to 3.  They didn't describe --

5    Q.  I'm not asking you what the actual schedule was.

6    A.  What exactly is.

7    Q.  What it says.

8    A.  I can't control the, the, you know --

9    Q.  I'm not asking you to, sir.  I'm just asking you if that's

10   what the document says.

11   A.  I know, but I refuse to answer this question.  You know,

12   this makes no sense to me.  This is not written by me.  This

13   is -- I'll ask just to, you know, let me work through this,

14   because this makes no sense to me, because anybody can write

15   hours, just because they, they don't even know.  I mean, those

16   are the kids that they write there, the time.

17   Q.  Sir, that's why you have an attorney.  If your attorney

18   wants to object, he can.  I'm asking you what the hours are on

19   the document that I gave you.

20   A.  The document you gave me, it says 12 to 11.

21   Q.  And then Saturday 4 p.m. to 12 p.m.?

22   A.  It says, yes.

23   Q.  And then Sunday from 3 p.m. to 11 p.m.?  11 a.m.?

24   A.  Yes, that's what it says.

25   Q.  OK.  Now I would like you to go to what's been marked for

1    identification as Plaintiff's P9, which is the Yelp page.  It

2    looks like this.  The next document.

3    A.  OK.  You see the mistake here, I didn't hear that part

4    because I can't -- you see, also this another one.  11 a.m.  Is

5    that -- do you follow here?  This makes sense to you?  It's 3

6    to 11 a.m.

7           MR. KUMAR:  Your Honor, if you -- my apologies.

8    Q.  Sir, if you would like to clean something up or any part of

9    your testimony, that's what your lawyer can come up here and

10   ask questions.  You don't have to ask -- answer any more

11   questions about that document.

12          Can we go to the next page, Plaintiff's P9

13   A.  This is done.

14   Q.  Can you go to the next document I gave you.

15   A.  This document you mean?

16   Q.  The next one.  Not the next page, the next document.

17          The next document, sir.

18          THE COURT:  You're referring to Plaintiff's Exhibit P9

19   for identification purposes, Mr. Kumar?

20          MR. KUMAR:  Yes, your Honor.

21          THE COURT:  Thank you.  Proceed.

22   Q.  On the top left-hand side, does it say "Arte Restaurant"?

23          MR. STRAND:  I renew my objection to all use of these

24   documents.

25          THE COURT:  On the basis that they were not in the

G6RACAJ3ps                    Hasangjikaj – cross

1   joint pretrial order?

2            MR. STRAND:  Yes, your Honor.

3            THE COURT:  Thank you.  Overruled.  Proceed.

4   Q.  Sir, on the top left-hand corner, does it say "Arte

5   Restaurant"?

6   A.  Yes.

7   Q.  Below that, there is a map.

8   A.  I see that.

9   Q.  Underneath the map, there is an address, 21 East 9th

10  Street, New York, New York, 10003.  Is that correct?

11  A.  Yes.

12  Q.  Is that the address for Arte Restaurant?

13  A.  Yes.

14  Q.  Below that there's a phone number, (212) 473-0077; is that

15  correct?

16  A.  Yes.

17  Q.  Is that the phone number for Arte Restaurant?

18  A.  Yes.

19  Q.  On the right-hand side, there's a column that says "hours."

20  Is that correct?

21           Bottom right-hand side.

22  A.  Right-hand side.

23  Q.  Right.

24  A.  Yes.

25  Q.  Underneath the hours, it says "Monday, 12 p.m. to 11 p.m."

1   is that what this document says?

2          MR. STRAND:  Objection again on pretrial order and

3   hearsay.

4          THE COURT:  Thank you.  With respect to the objection

5   on the basis that this is a document that was not included in

6   the pretrial order, I am not sustaining that objection.  These

7   documents are being offered for impeachment purposes.

8          Now, neither of these documents is in evidence, and so

9   to the extent that the request is for Mr. Hasangjikaj to

10  provide testimony regarding the content of these documents,

11  neither is in evidence, and as a result I'll sustain that

12  objection, to the extent that the objection is to ask

13  Mr. Hasangjikaj to testify as to the content of a document that

14  is not in evidence and that has not been authenticated.

15         MR. STRAND:  Thank you, your Honor.  I move to strike

16  all testimony regarding these documents.

17         THE COURT:  Thank you.  Denied.  I'm sustaining your

18  most recent objection.

19         MR. KUMAR:  I'll move on, your Honor.

20         THE COURT:  Thank you.

21         MR. KUMAR:  No more questions for this witness, your

22  Honor.

23         THE COURT:  Thank you very much.

24         Mr. Strand, do you have any questions for

25  Mr. Hasangjikaj?

1          MR. STRAND:  Yes, I do, on redirect.  Thank you, your

2    Honor.

3    REDIRECT EXAMINATION

4    BY MR. STRAND:

5    Q.  Azem, this is what's called redirect testimony, which is in

6    response to cross-examination, and I'm going to state the

7    portions of the cross-examination that I am responding to.

8    Beginning with when you described Segundo as an independent

9    contractor, is he paid on a W-2, if you know, or on a 1099?

10   A.  Both, 1099 and W-2.

11   Q.  He gets both.

12   A.  Yes.

13   Q.  Just clarifying the terminology there.

14          Now, when they said, regarding written records of the

15   shifts worked, can you just clarify, were written records kept

16   of the shifts worked?

17   A.  We have the schedule of the days that he worked.  That's

18   what the agreement was.  The schedule of his days that he

19   worked.  We also made sure that he -- he doesn't exceed the

20   time, you know, because of his history in the past, you know.

21   He lives on the, you know, the train station.  This guy waits

22   for them to sue the restaurants and they make our lives

23   miserable.  You know, that's what it is.  You know, this guy's

24   agreement for him to get paid $700.  And I don't know how to

25   explain that.  Hours, five hours, six hours, three hours, he

G6RACAJ3ps                    Hasangjikaj - redirect

1    got paid $700.  And he did not exceed this time.

2    Q.  Sure.  Thank you.

3         You were asked about, do you feel the -- well, let me

4    ask that differently.  How accurate are these documents as to

5    whether or not they show whether the plaintiff worked overtime?

6    A.  They are accurate.

7    Q.  So they accurately show that he did not work overtime?

8    A.  Mostly, yeah, you know.  I know what's going on.  I'm there

9    every day.

10   Q.  Sure.  And when you were asked about the payroll taxes,

11   which I didn't think was relevant, but are any payroll taxes

12   taken out on a 1099?

13   A.  Yes.

14        No, no, no.  No.  From 1099, no.

15   Q.  Are payroll taxes paid on a W-2?

16   A.  Yeah.  At the end of the year.

17   Q.  So when you are asked whether or not payroll taxes were

18   probably taken out on a 1099, the answer is, no, because there

19   are no payroll taxes on a 1099.  Correct?

20   A.  Yes.

21   Q.  Thank you.  That's a little bit leading --

22   A.  No, no, no.

23   Q.  -- but to be clear on the tax laws.

24        You do not personally supervise any social media pages

25   for the restaurant, do you?  Like Yelp and Facebook.

G6RACAJ3ps

1   A.  Can you repeat that again?

2   Q.  You don't manage a Facebook page for the restaurant.

3   A.  No, I don't.

4   Q.  Do you, to your knowledge, do you know of anyone at the

5   restaurant who does?

6   A.  The workers probably do, the ones that have a Facebook, but

7   that doesn't mean it's accurate information.  Maybe the

8   address, the thing, but, I mean, to me this doesn't make any

9   sense that you, you know, like investigate -- it's there.

10  Their hours are there.  I'm not saying something that is not.

11  I'm just saying that, you know, this is -- I'm open for 23

12  years and I'm not faking the hours.  So whatever hours worked,

13  he, his schedule was 10 o'clock.  You talking about specific

14  guy, who is Luis Cajamarca, his time.  He will be changed hours

15  and time.  So this is the guy.  I don't know what they have on

16  Facebook.  I have no idea -- actually everything is wrong there

17  the way they describe, but, you know, I don't manage and I

18  don't know, honest.  I have no idea.  I don't have time for

19  that.  I work seven days.

20  Q.  Does that go for the Yelp page as well?

21      Do you manage the Yelp page?

22  A.  I do not.  I don't manage nothing as far as Internet.  I

23  have no idea.

24  Q.  Sure.  OK.

25      MR. STRAND:  All right.  I have no further questions.

G6RACAJ3ps

1              THE COURT:  Thank you very much.

2              Any additional questions on cross-examination for this

3    witness, Mr. Kumar?

4              MR. KUMAR:  No, your Honor, no recross.

5              THE COURT:  Thank you very much.

6              Thank you very much, Mr. Azem Hasangjikaj.  You can

7    stell down.  Thank you.

8              THE WITNESS:  Thank you.

9              (Witness excused)

10             THE COURT:  Mr. Strand, do you have any additional

11   testimony that you would like to present to the Court?

12             MR. STRAND:  No, your Honor, I do not.  Thank you.

13             THE COURT:  Thank you.  Do you rest?

14             MR. STRAND:  Yes, your Honor, I do.

15             THE COURT:  Thank you very much.

16             Thank you, counsel.  The case is now submitted.  Let's

17   turn to closing arguments.

18             MR. KUMAR:  Prior to closing, plaintiff has several

19   applications that he would like to make to the Court.

20             THE COURT:  Thank you.  Proceed.

21             MR. KUMAR:  Specifically, plaintiff would like --

22             THE COURT:  You can step down, Mr. Hasangjikaj.  Thank

23   you very much.

24             MR. HASANGJIKAJ:  Thank you, your Honor.

25             MR. KUMAR:  Your Honor, could I move to the lectern?

G6RACAJ3ps

1          THE COURT:  Please do.

2          MR. KUMAR:  Your Honor, plaintiff requests an adverse

3     inference against the defendants and each of them concerning

4     the plaintiff's schedule throughout his employment with the

5     defendants.  Specifically, the defendants failed to call Mr.

6     Hasangjikaj's daughter and Vilson Brulha, whose duty it was, as

7     defendants stated, to keep track of the hours that the

8     plaintiff worked.  Both of these people were directly under the

9     defendant's control and have material information regarding

10    Mr. Cajamarca's actual schedule.  Therefore the plaintiff

11    requests an adverse inference that, because neither of these

12    people were called, that they would actually bolster

13    Mr. Cajamarca's testimony regarding his schedule.

14         THE COURT:  Thank you.  Let me hear from you, please,

15    Mr. Strand.

16         MR. STRAND:  I object to that.  I think that that's

17    something that probably belongs in closing argument.  I don't

18    know much law on that matter and would at least like an

19    opportunity to brief it.  To me this goes to argument.  And if

20    we're going to have adverse inferences, I would like an adverse

21    inference based on his spouse.  But to me that's something to

22    be addressed in closing argument.  I mean --

23         THE COURT:  Thank you.  Let me take up this issue.

24    First, Mr. Kumar, do I understand you correctly that you wish

25    for the Court to draw an adverse inference from the fact that

G6RACAJ3ps

1    the defendant did not choose to call those two witnesses at

2    trial; is that correct?

3              MR. KUMAR:  Yes, your Honor.

4              THE COURT:  Is there any other basis for the request?

5              MR. KUMAR:  Defendant's daughter was not on the Rule

6    26 disclosures, but that's the only basis, your Honor.

7              THE COURT:  Thank you.  Was there any reason why those

8    witnesses, having presumably been disclosed to you during -- in

9    the 26(a) disclosures, you did not subpoena?

10             MR. KUMAR:  Mr. Brulha, when we tried to schedule his

11   deposition, defendants waived calling him at trial today.  I

12   did not subpoena either of those defendants, your Honor --

13   either of those parties.

14             THE COURT:  Thank you.  The request for me to draw an

15   inverse inference as a result of the failure by one side to

16   call a particular set of witnesses at trial is denied.  Both

17   parties have subpoena power, and plaintiffs could also have

18   called those witnesses if you wished to.  Mr. Strand's decision

19   not to call those witnesses does not, I believe, justify the

20   Court's entry of a, quote, adverse inference, close quote, as a

21   result of his decision not to call particular witnesses.

22             Proceed.

23             MR. KUMAR:  That's it, your Honor.

24             THE COURT:  Thank you very much.

25             MR. KUMAR:  Thank you.

G6RACAJ3ps                    Summation - Mr. Kumar

1              THE COURT:  Let's turn now to closing arguments if we

2       can.  I will hear first from plaintiff.  Then I will hear from

3       defendant.  Then I will have a short rebuttal for plaintiff.

4       But I would net that the rebuttal should be a rebuttal, not an

5       additional closing statement.

6              MR. KUMAR:  Understood, your Honor.

7              THE COURT:  Proceed.

8              MR. KUMAR:  When I opened earlier today, I said this

9       case, like all HR cases, were ultimately about fairness.  Now

10      is the time for the Court to implement that idea through the

11      burden-shifting framework that has been espoused by the Supreme

12      Court in *Anderson v. Mt. Clemens Pottery Company*.  I'm sure the

13      Court is familiar with the framework, so I won't go over it.

14      Instead, I would like to begin with the defendants' only time

15      records.

16             Now, what the defendants have given in this action to

17      defend themselves against Mr. Cajamarca's accusations, the

18      first page of Defendant's A, labeled "weekly schedule," is a

19      single sheet of paper which has checks and Xs on it.  On the

20      stand, the one defense witness stated that that is not how they

21      actually kept their records for the plaintiff or anybody else,

22      and that that specific sheet was created after Mr. Cajamarca

23      actually worked there.

24             The plaintiff's name isn't listed anywhere on that

25      document.  It's undated.  And even if what the defendants state

1   was true, that the way they kept their records were by checks

2   and Xs, that single document doesn't have a lunch shift,

3   doesn't have a dinner shift, like the defendants have claimed

4   how they keep their records.

5           The rest of Defendant's Exhibit A consists of payroll

6   records.  According to these payroll records, my client worked

7   exactly 40 hours per week, every week, the entire time he

8   worked for the defendant.  Defendants themselves have stated

9   that he actually did not work 40 hours per week every week.

10  And these documents also show that my client -- pardon me.  Not

11  only did the defendants state that my client didn't work 40

12  hours per week every week; they said that that's just how they

13  entered the documents into their payroll system for the sake of

14  simplicity.

15          Further, defendants have admitted that the gross wages

16  on the payroll records are also incorrect.  In his direct

17  testimony, as well as on cross, defendants have stated that the

18  client -- my client, Mr. Cajamarca, actually received a net

19  payment of $700 per week, not the $450 listed on the remaining

20  pages of Defendant's Exhibit A.

21          Through their own admission and the documents before

22  the Court, the defendants have shown that they have not

23  produced adequate and accurate pay records for Mr. Cajamarca.

24  None of the records show the exact number of hours that

25  Mr. Cajamarca worked or the exact amount that he was paid.  Due

1    to this failure, Mr. Cajamarca is forced to rely on his own

2    best recollections of the amount he was paid and the amount of

3    hours that he worked.  How do you do this?  He testified today

4    and was subject to cross-examination by the defendants.  He

5    testified that he began working for the defendants on April 25,

6    2014.  He testified that he was a pasta man and his duties were

7    making pasta and breaded meats.  Importantly, he also testified

8    that, according to his best recollections, he worked Tuesdays

9    and Thursdays from 11:30 a.m. until 10 p.m., Fridays and

10   Saturdays he worked from 3:30 p.m. till 12 a.m., and Sundays he

11   worked from 3:30 p.m. until 10 p.m.  That totals to 44 1/2

12   hours per week.

13           He also testified that he was paid a net salary of

14   $700 per week.  Defendants readily admit that he was paid that

15   set salary and that salary did not change through the pendency

16   of his employment.

17           And finally, Mr. Cajamarca testified that he was

18   terminated on September 10, 2015.

19           Now, in order to rebut the plaintiff's testimony in

20   this action, the defendants called one witness,

21   Mr. Hasangjikaj, who comes to work every day at 4 p.m., every

22   day, seven days a week.  He did not call Mr. Vilson Brulha, who

23   he testified is in charge of keeping track of when the

24   employees come in.  Nor did he call his daughter, who is also

25   in charge, as she opens up the restaurant.  Instead of having

G6RACAJ3ps                    Summation - Mr. Kumar

1    someone with knowledge testify to these material facts,

2    defendants rely solely on Mr. Hasangjikaj's testifying.  What

3    did he actually testify to?  He testified that he himself did

4    not arrive at Arte until 4 p.m. every day, hours after

5    Mr. Cajamarca's shift actually started.  He testified that

6    Mr. Cajamarca was paid a salary.  He testified that

7    Mr. Cajamarca worked between five and six days per week, but

8    he's not sure how many days per week he actually worked.  And

9    he testified that he didn't pay payroll taxes on part of

10   Mr. Cajamarca's salary.

11          Lastly, he testified to the hours of Arte Restaurant,

12   but read aloud from both the Facebook page and a Yelp page that

13   show that Arte Restaurant was opened approximately one or two

14   hours later than what he testified to.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              MR. KUMAR:  In this scenario, with these facts and

2    documents before the Court, the defendants cannot be said to

3    have carried their burden of rebutting the plaintiff's best

4    recollections.  Therefore, the plaintiff asks the Court what in

5    fairness he deserves from the defendants, namely, that the

6    Court finds that each of the defendants violated the Fair Labor

7    Standards Act and the New York Labor Law and give damages to

8    the plaintiff of $8,505 in unpaid overtime wages, $1,207.50 in

9    unpaid spread of hours wages, $8,505 in federal liquidated

10   damages, $9,712.50 in New York State liquidated damages,

11   prejudgment interest on Mr. Cajamarca's spread of hours claims,

12   and, finally, attorneys' fees and costs, as well as any other

13   relief that the Court finds just, proper, and, of course, fair.

14   Thank you.

15              THE COURT:  Thank you, counsel.

16              Mr. Strand, closing argument.

17              MR. STRAND:  Thank you, your Honor.

18              31 words.  That's what this case comes down to, is the

19   31 words in No. 16 of the direct testimony of this plaintiff.

20   That's sort of the genu block, if you will, on all of this

21   standing, and it's quite frankly an incredibly flimsy genu

22   block.

23              And the issue in this case, first and foremost, is

24   whether or not you believe this 31 words of uncorroborated

25   self-serving testimony.  And in the context of that here are

1      some questions I think we should ask ourselves.

2              Question No. 1:  Why is this testimony so vague?  You

3      can see that when you compare it to Mr. Hasangjikaj's

4      testimony.  Mr. Hasangjikaj talked about the meal break, talked

5      about the food they cooked, talked about the seasonal

6      fluctuations.  It's a little slower in the summertime.  Talked

7      about all these things.  There is a dinner shift, there is a

8      lunch shift.  This paragraph 16 from the plaintiff, it's so

9      vague and the lack of details to me makes it unbelievable,

10     especially compared to the detailed testimony which he was

11     cross-examined on and repeated with very high consistency, so

12     that's the first thing.

13             Now, everybody agrees that this restaurant opens at

14     noon.  In fact, opposing counsel even showed those hours in my

15     client's face.  This plaintiff claims he started work at 11:30,

16     and I could see maybe sometimes a cook might need to get there

17     early, like slice peppers or something or maybe a buffet, we

18     need to make the bourbon chicken earlier.  It's not even

19     addressed.  And I don't understand why a pasta cooker -- this

20     is a sitdown Italian restaurant.  A pasta cooker would cook to

21     order spaghetti for someone who comes in for lunch.  I don't

22     see why he needed to get there 30 minutes before opening.

23     Could there be an explanation?  Maybe.  But it is completely

24     not even touched on here.  That's an important thing.

25             Same thing with closing time.  The closing time -- I

1    forget if this was in the direct testimony or not, but the

2    restaurant has a bar within it.  And so we might be confusing

3    kitchen and food closing time with bar closing time.  Anyway,

4    those records, those social media offered by opposing counsel,

5    are just as inconsistent with the plaintiff's testimony.

6              Now, the plaintiff said he worked in this kitchen

7    until midnight.  This is an Italian restaurant in Greenwich

8    Village.  Who orders spaghetti at 11:30?  I could see where a

9    diner might have a food crowd that late or maybe a fast food

10   place.  I moved here from New Orleans.  We had some 24-hour

11   burger joints in the French Quarter.  It does not make sense.

12   Mr. Hasangjikaj's testimony makes sense.  The 4 p.m. to 5 p.m.

13   break to eat a dinner makes sense when you think about

14   restaurants.  Human gastronomy.  Is that the right word?  I'm

15   just a simple man.  As far as the no fluctuation at all that

16   the plaintiff testified to, I don't buy that.  Everybody knows

17   things fluctuate sometimes, schedules change.

18             And as far as the question I asked about subway train,

19   I did a little experiment and I did not know how it was going

20   to turn out.  This plaintiff claims he worked the exact same

21   schedule for a year and a half and that he took the No. 7 train

22   and transferred to the N and the Q.  If he worked the exact

23   same schedule, he should darn know well what time he left if he

24   left home the same times for a year and a half.  And he had no

25   clue.  If he's making these hours up or fudging them, then he

G6RMCAJ4                    Summation - Mr. Strand

1    should have a good answer, which he did not.  My experiment

2    panned out.  I used the scientific method.  I tested a

3    hypothesis.  I think that testimony is important.  Question No.

4    1, why such vague testimony.

5           Now, question No. 2, I suppose, is, what do these

6    records say?  I would like to point out, yes, the records don't

7    record the exact start time, the exact end time.  But there is

8    a record and there is testimony about the records.  And I think

9    that shows Mr. Hasangjikaj's honesty.  It would not have been

10   that hard to cook up some bogus spreadsheets.  He chose to be

11   honest and turn over what we actually had.  They do keep track.

12   They don't record the exact minute, but that's not required

13   under federal regulations.  That's question No. 2.

14          Now, the plaintiff doesn't dispute that he got pay

15   stubs.  If these pay stubs -- and that there were records, if

16   he said 40 and he was working overtime every single week for a

17   year and a half and he didn't say anything, I don't buy it.  I

18   don't buy it at all.  I don't believe a word that this

19   plaintiff says.  That's question No. 2, what do the records

20   say.  And I think it's important that we can infer some

21   reliability from Mr. Hasangjikaj in that he chose to be honest

22   and turn over the real records.  We did not fudge them.  We

23   were honest and we disclosed what we really had.  Precise time

24   is not the same as time.

25          Question No. 3.  We have got our three questions.

G6RMCAJ4                    Summation - Mr. Strand

1    Question No. 1 is why such vague.  Question No. 2 is what the

2    records say.  Question No. 3, why does he qualify his

3    statement.  He starts it with, and I'm in paragraph 16:

4    According to my best recollections.  He is not even certain.

5    He wants this Court to be certain enough to sign a judgment for

6    God knows how much money, and he is not even willing to say

7    definitively.  Mr. Hasangjikaj did say definitively repeatedly,

8    on direct, on cross, he told the same story.  I think that's

9    the important question, you know.  Why the need to put in this

10   escape hatch language or to the best of my knowledge.  It

11   reminds me of one -- how do you tell if lawyers are lying?

12   Their lips are moving.  When people put in phrases like, to the

13   best of my knowledge or, as I recall.  That's question No. 3.

14          Question No. 4, why is there a lack of corroboration

15   here.  I mentioned this a little bit in the brief.  Surely, he

16   had someone with him who you could have attested to the hours

17   he worked, when he left, when he got home.  And he said he

18   didn't have a bank account, but his spouse did.  I don't know

19   that this is as strong.  But he said he took the subway.  How

20   did he take the subway?  You use a MetroCard.  What happens

21   when your card runs out?  You pull out your wallet, or I use my

22   Gulf Coast Bank card, you refill the card.  That should create

23   evidence.  I guess it's not impossible if he always paid cash

24   for it.  I don't know if you can.  Maybe.  It's another issue,

25   the lack of corroboration.  Often people use smart phones, they

1    use texting.  They say, I'm about to get off work.  He might

2    have sent an e-mail or a Facebook post.  And there is just

3    nothing like that.  And this evidence would exist if he was

4    telling the truth, I submit.  Anyway, that's question No. 4.

5         No. 5, why, after -- I guess it was 23 years.  I

6    apologize.  I said 30 in the opening.  23 years.  Why after 23

7    years did this restaurant start to become shysters.  23 years

8    without a complaint.  And all of a sudden they say, we aren't

9    paying people for overtime.  I don't buy it.  Which is more

10   likely, that all of a sudden a restaurant decides to do wrong

11   by its employees, or that one employee, after getting fired,

12   decides to get greedy.  I submit the latter is the more

13   reasonable inference.

14        Anyway, question No. 6 is, what are the incentives to

15   be dishonest here?  I can see there is incentives to be

16   dishonest on both sides, but I think we have to recognize that

17   this is a lawsuit, there is money riding on this.  There is an

18   incentive to stretch the truth because you get money by

19   stretching the truth.  That is something to consider.  Those

20   are my six questions to ask ourselves.

21        Now, let me talk a little bit about the law and

22   *Anderson* and some of these wonderful labor cases which we will

23   talk about.  Opposing counsel said in his brief that there is a

24   presumption that the plaintiff is correct in a case like this,

25   and that is absolutely wrong.  That is not what any court has

1    said about it.  The word presumption does not appear in the

2    *Anderson v. Mt. Clemens Pottery*.  To understand that ruling

3    let's talk a little bit about the facts of that case.

4           Now, in *Anderson* what happened was, you had this

5    factory and they were punching cards.  And what happened was

6    the factory was shortchanging them on the hours.  If you came

7    in at 6:46 at this factory and punched your card at 6:46, you

8    were credited for 7.  They rounded it down.  And if you left at

9    12:14, you were credited for leaving at 12.  They were

10   shortchanging them by the hours.  When they were sued, this

11   factory, as the weasels they were, said, we don't know how

12   much, so you can't prove anything, so nana nana nana.  I don't

13   how you notate that on the script, but anyway.

14          The Supreme Court said no.  We can use just a

15   reasonable inference.  That is the standard.  It does not mean

16   the recollection is presumed to be correct.  And there are many

17   examples of that in the cases.  The plaintiff still needs to

18   demonstrate by a just and reasonable inference that what he

19   says is true.

20          Now, the courts have said I guess it's possible, based

21   on recollection, but they do not say that the recollection is

22   presumptively true, especially when we are talking about 31

23   words of wishy-washy testimony and that's all he has to say

24   about it.  Not addressing the seasons, not addressing the fact

25   that he was working while the restaurant was closed.  It's

1   debatable whether the standard of *Mt. Clemens* applies here.

2   But I don't think this plaintiff's testimony meets it.

3           And just for another example.  A case that was cited

4   was the *Doo Nam Yang* case.  I think it was a sewing machine

5   worker.  If you read that decision you see that the testimony

6   was corroborated.  Mr. Yang's employer agreed, yes, he started

7   at 7, so they didn't just take his word for it.  They were

8   maybe a little more generous in their extrapolating of what

9   Mr. Yang's hours were, but they didn't say, 31 words, we got

10  it, let's go home.  There is more of a burden of proof than

11  that.  I read the standard under this *Mt. Clemens* case as not

12  high, but I think it's higher than 31 words, higher than that.

13          Anyway, that's my response to these arguments that the

14  plaintiff is presumptively correct.  All he has to do is come

15  in here and say 31 words which are qualified.  I am not sure.

16  And without any corroboration, which are very vague and which

17  are highly questionable, given his inability to answer about

18  the subway or to explain why he was working when the restaurant

19  was closed.

20          Anyway, the other issues I think I addressed mostly in

21  my memorandum as for the causes of action.  I'll just close by

22  summarizing by questions.  1.  Why such vague testimony.  Why

23  does it not address these things.  And is that believable.

24  Does it address why he was working when the restaurant was

25  closed.  Since it didn't fluctuate at all.  I don't buy that at

G6RMCAJ4                        Summation - Mr. Strand

1    all.  Work shifts change, restaurants fluctuate.

2    Mr. Hasangjikaj's testimony on this is believable, is credible.

3            Question No. 2.  What do the records say.  I think

4    regardless whether the Court wants to consider these records

5    accurate enough, there is some semblance of records here.  They

6    kept track of shifts and it shows Mr. Hasangjikaj's honesty.

7    That's question 2.

8            Question 3.  Why does he need to qualify his

9    statement.  Why does he put the escape language in here.  He is

10   not even sure.  He wants to be sure.  He is not sure.

11           Question 4.  Why is there a lack of corroboration.  I

12   just got attacked for not calling more witnesses.  I feel one

13   is enough.  I think this plaintiff's testimony is clearly

14   insufficient.  Why didn't he call someone else.  Same thing.

15   And he has the initial burden here.

16           And question 5, why did this restaurant suddenly

17   decide to shortchange somebody after 23 years without a

18   problem.

19           With respect to the last question, the incentive to

20   lie, Mr. Kumar began both his opening statement and his closing

21   argument with a discussion of fairness and the policy purposes

22   of the Fair Labor Standards Act, which I had a fun time

23   learning about.  I really don't do labor law.  I'm a tax

24   lawyer.  I had fun with this case.  And I also think when we

25   are looking at the policies of law, such as the Fair Labor

1    Standards Act, which is a beloved piece of legislation.  It has

2    done a lot of good.

3            I think one of the biggest enemies of laws designed to

4    help people, like minimum wage, like welfare, like Medicaid,

5    things like that, I think one of the biggest enemies of those

6    is abuse, when people take the generosity afforded by these

7    things and abuse them.  And the Fair Labor Standards Act cases

8    create a generous standard of proof for some plaintiffs.

9    *Anderson v. Mt. Clemens*.  But we need to be careful that we

10   don't let this generosity get abused.

11           The Fair Labor Standards Act allows for attorneys'

12   fees and allows for costs, liquidated damages.  And I think

13   it's important to recognize that when these things get abused,

14   whether it's by welfare claims or greedy lawyers or whatever,

15   that it engenders dislike for the system.  I think nothing

16   would serve the policies of the Fair Labor Standards Act more

17   than rightfully holding that this plaintiff is not credible,

18   his testimony is not sufficient.  I do not believe a word he

19   says and neither, your Honor, should this Court.  Thank you.

20           THE COURT:  Thank you, Mr. Strand.

21           Any rebuttal, Mr. Kumar?

22           MR. KUMAR:  Short one, your Honor.

23           THE COURT:  Thank you.

24           MR. KUMAR:  Mr. Strand goes on and on about various

25   questions that Mr. Cajamarca failed to answer.  What he fails

1    to say, though, is that the defendants have the burden of

2    keeping accurate and adequate records so that Mr. Cajamarca

3    would not have to rely on his best recollections.  He worked

4    from 2014 to 2015 and, to the best of his knowledge, is what he

5    testified here to today.

6            Why so vague?  It's been approximately a year since he

7    last worked there.  He has probably had several jobs in

8    between.  But that's not something that this Court should

9    punish the plaintiff for.  *Anderson v. Mt. Clemens* is designed

10   to help plaintiffs in this exact position.

11           Where the defendants do not have adequate or accurate

12   records, the plaintiffs cannot be held responsible for not

13   remembering exactly when they came in or exactly when they

14   left.  The Second Circuit has also said that the plaintiff can

15   make his burden using his recollection alone, in *Kuebel v.*

16   *Black & Decker*.

17           As to what do the records say, it's correct, we don't

18   actually know what the records say.  What the defendants have

19   said is Mr. Cajamarca didn't work exactly 40 hours, but that's

20   what the records say.  They have records that show a weekly

21   schedule that might have been created after Mr. Cajamarca left.

22   They have no records of even the shifts that they claim

23   Mr. Cajamarca actually worked.

24           As for the qualifying language, you are right, he said

25   it to the best of his recollection, which is all he can do.  If

the defendants had kept adequate and accurate records, we

wouldn't even be having this discussion.  And the plaintiff's

lack of corroboration.  Maybe he paid for his MetroCard in cash

every time.  He said he didn't have a bank account.  Again, the

burden was on the defendants to come forth with these records.

So he would have to come forward with this corroboration.

          And the defendants mentioned something interesting.

After 23 years, this is the first time the defendants have been

sued.  Now, I don't know why the defendants have not been sued

before.  Even a short look at their records show that they

didn't keep adequate or accurate time records.  But we don't

know whether or not they settled out of court or whether they

had an arbitration process in place prior to Mr. Cajamarca

coming in.  We don't know whether or not before he terminated

other employees he had them sign general releases so they

couldn't sue him before.

          Lastly, the incentives to be dishonest.  Defendants

talk about this at length and although they say that the

plaintiff has incentives to be dishonest in that he would get a

damage award, they failed to say what the incentives of their

dishonesty could be, meaning they won't have to pay someone

they have refused or failed to pay overtime to.  This incentive

should work both ways.

          The defendant, although while being subject to

cross-examination, he is angry.  He doesn't like the fact that

G6RMCAJ4

1    he's being sued, but that doesn't automatically make him

2    honest.  The only people that actually know the hours that

3    plaintiff worked in this case are Mr. Cajamarca and maybe two

4    other people that have not been called as witnesses at all.  No

5    records show the exact number of hours.  No records show the

6    exact amount of pay.  Defendants have failed in their burden,

7    and we ask that the Court give the plaintiff damages as

8    requested in closing.

9         THE COURT:  Thank you very much.  Thank you all for

10   your presentations of evidence and argument.  As I said

11   previously, the case is fully submitted.  I've heard your

12   arguments.  I am going to take a recess now, not adjourn, take

13   a recess until 2 p.m., at which time we will reconvene this

14   matter to discuss what will happen next.  I will see you all

15   back here at 2 p.m. promptly.  Thank you.

16        (Recess)

17        (Continued on next page)

18

19

20

21

22

23

24

25

1          THE COURT:  Thank you all for reconvening here now.  I

2     am going to issue my decision now.  This decision is

3     approximately 12 pages, single spaced, in length, so please be

4     patient as I review this.  I think it will be appropriate for

5     me to resolve this matter promptly.

6          I.  Overview.  Plaintiff Luis Cajamarca brings this

7     lawsuit under the Fair Labor Standards Act and New York Labor

8     Law claiming that he is owed compensation for: (1) unpaid

9     overtime under the FLSA; (2) unpaid overtime under the New York

10    Labor Law; and (3) unpaid spread of hours pay under the New

11    York Labor Law.

12         I am going to incorporate most of my relevant findings

13    of fact into my detailed analysis of the defendants' liability.

14    I would, however, first like to find some basic facts so that

15    they are established as a baseline for the remainder of my

16    decision.

17         Plaintiff Luis Cajamarca was employed as a cook by

18    Yerina Restaurant Corporation, which does business as Arte

19    Restaurant, from April 25, 2014 to September 10, 2015.  Arte

20    Restaurant is an Italian restaurant located at 21 East 9th

21    Street, New York, New York, 10003.

22         Arte Restaurant (which I will refer to as "the

23    restaurant") had gross receipts of $500,000 or more each year

24    from 2012 through 2015, inclusive.  The restaurant served beer

25    and wine and other products that were moved in interstate

1    commerce, and Mr. Cajamarca handled such goods in the course of

2    his employment.

3           During the course of his employment at Arte

4    Restaurant, Mr. Cajamarca was paid $700 each week.

5    Mr. Cajamarca was paid by a combination of check and cash.

6    Each week he would receive an envelope that contained cash, a

7    check, and a pay stub.  The pay stubs did not state a rate of

8    pay or the number of hours Mr. Cajamarca worked, and they

9    stated that his gross pay was $450 per week and his net pay was

10   $390 per week.

11          Defendant Azem Hasangjikaj is the president and sole

12   owner of Yerina Restaurant Corporation and the manager of Arte

13   Restaurant.  Mr. Hasangjikaj told Mr. Cajamarca what tasks

14   Mr. Cajamarca needed to perform and explained his work duties

15   to him, had the power to alter Mr. Cajamarca's work schedule by

16   giving him the day off, and paid Mr. Cajamarca.

17   Mr. Hasangjikaj also hired and fired Mr. Cajamarca.

18          II.  Liability.  Defendants do not dispute that Yerina

19   Restaurant Corporation and Mr. Hasangjikaj were Mr. Cajamarca's

20   employers.  The facts that I just outlined, coupled with the

21   law that I am about to explain, make clear that those two

22   defendants are liable as employers under the FLSA and New York

23   Labor Law.  I find myself forced to conclude that Mr. Calle is

24   also liable as an employer, but as I will describe, the

25   question of defendant Segundo Calle's liability, while clearly

G6RACAJ5ps                    Decision

1    established on this record, as presented by counsel, is

2    somewhat more fraught.

3            The FLSA imposes liability on the "employer" of any

4    employee who is subjected to the employer's violations of the

5    FLSA's overtime provisions.  *See* 29 U.S.C. § 216(b).  The term

6    "employer" "includes any person acting directly or indirectly

7    in the interest of an employer in relation to an employee."  29

8    U.S.C. § 203(d).  The Supreme Court "has instructed that the

9    determination of whether an employer-employee relationship

10   exists for purposes of the FLSA should be grounded in 'economic

11   reality rather than technical concepts,' determined by

12   reference not to' isolated factors, but rather upon the

13   circumstances of the whole activity.'"  *Barfield v. New York*

14   *City Health & Hospitals Corp.,* 537 F.3d 132, 141 (2d Cir. 2008)

15   (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28,

16   33 (1961) and *Rutherford Food Corp. v. McComb*, 331 U.S. 722,

17   730 (1947)).

18           An entity may be considered an employer based on its

19   exercise of either "formal control" or "functional control."

20   *Barfield*, 537 F.3d at 141-43.  And, under certain

21   circumstances, an individual within a company may be held

22   personally liable under the FLSA as an employer.  See *Inclan v.*

23   *New York Hospitality Group, Inc.*, 12-cv-4498 (NRB), 2015 WL

24   1399599, at *13 (S.D.N.Y. Mar. 26, 2015) (citing *Irizarry v.*

25   *Catsimatidis*, 722 F.3d 99, 105 (2d Cir. 2013)).  "When it comes

G6RACAJ5ps                    Decision

1    to 'employer' status under the FLSA, *control is key*." *Glatt*,

2    293 F.R.D. at 525 (internal quotation marks omitted) (emphasis

3    added).  The Second Circuit has adopted a four-factor test to

4    measure formal control: "whether the alleged employer (1) had

5    the power to hire and fire employees, (2) supervised and

6    controlled employee work schedules or conditions of employment,

7    (3) determined the rate and method of payment, and (4)

8    maintained employment records." *Carter v. Dutchess Community*

9    *College*, 735 F.2d 8, 12 (2d Cir. 1984) (internal quotation

10   marks omitted).  Although the *Carter* factors are sufficient to

11   establish employment status, a positive finding on all four

12   factors is not necessary to establish employment status -- the

13   Circuit has emphasized that in determining whether an

14   employer-employee relationship exists, courts must consider

15   "the totality of the circumstances" and avoid the "mechanical

16   application" of any set of factors.  *Barfield*, 537 F.3d at 143.

17            The Second Circuit has "emphasiz[ed] two particular

18   areas of inquiry for cases involving individual defendants

19   alleged to be FLSA employers." *Inclan*, 2015 WL 1399599, at

20   *14.  The first inquiry concerns "the scope of an individual's

21   authority or 'operational control' over a company," and the

22   second inquiry concerns "hypothetical versus actual power."

23   *Irizarry*, 722 F.3d at 106.  Under the first inquiry, "an

24   individual defendant must possess control over a company's

25   actual 'operations' in a manner that relates to a plaintiff's

G6RACAJ5ps                    Decision

employment." *Irizarry*, 722 F.3d at 109.  "Some degree of

individual involvement in a company in a manner that affects

employment-related factors such as workplace conditions and

operations, personnel, or compensation" is required for an

individual to be considered an employer.  *Id.*  Under the second

inquiry, operational control "need not be exercised constantly

for an individual to be liable and you the FLSA."  *Irizarry*,

722 F.3d at 110.

        Defendants, in their pretrial memorandum of law, argue

that Mr. Calle is a "senior cook," without any authority to

hire, fire, or pay employees.  In their answer, however,

defendants admitted that Mr. Calle is "a principal, officer,

and/or manager" of Arte Restaurant (Compl. ¶ 6), that he had

the power to hire and fire employees (Compl. ¶¶ 23 and 24),

that he could tell Mr. Cajamarca what tasks to complete,

control Mr. Cajamarca's work schedule, and control the rate and

method of Mr. Cajamarca's pay (Compl. ¶¶ 25, 26, and 27), and

that Mr. Calle "acted as plaintiff's employer within the

meaning of the FLSA and the New York State labor law"

(Compl. ¶ 31; Defendants' Answer ¶ 1).

        "A party's assertion of fact in a pleading is a

judicial admission by which it normally is bound throughout the

course of the proceeding."  *Bellefonte Re Ins. Co. v. Argonaut

Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985) (citations omitted);

*see also PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d

G6RACAJ5ps                    Decision

120, 123 (2d Cir. 1984) ("Under federal law, stipulations and

admissions in the pleadings are generally binding on the

parties and the court.").  Courts may, however, disregard a

stipulation "if to accept it would be manifestly unjust or if

the evidence contrary to the stipulation is substantial."  *PPX

Enterprises*, 746 F.2d at 123 (quoting *Loftin and Woodard, Inc.

v. United States*, 577 F.2d 1206, 1232 (5th Cir. 1978) (internal

quotation marks omitted)); *see also Interglobo Customs Broker,

Inc. v. Herschel Imports, Inc.*, No. 14-cv-4995 (KNF), 2015 WL

3756799, at *9 (S.D.N.Y. June 5, 2015) (applying the same

manifest injustice/substantial evidence standard to admissions

made in pleadings and permitting a defendant to amend its

answer where the court found "a substantial basis exists...to

have a concern regarding the amount [of money owed] admitted by

defendant in its answer").

        In addition to the admission in the answer,

Mr. Cajamarca has testified that Mr. Calle supervised his

day-to-day activities and told him which tasks to complete and

the order in which they should be completed, and Mr. Calle

testified that he could hire employees (*see* the Calle

deposition 19:14-20: 15), and that he set the kitchen workers'

schedule (*see* the Calle deposition 24:6-24:9).

        Candidly, I have real qualms about finding that

Mr. Calle, who did not testify today, acted as an employer

within the meaning of the FLSA and New York Labor Law.  That is

1    because Mr. Strand has argued in his written submissions that

2    Mr. Calle was merely a cook.  But while Mr. Strand has

3    presented that argument, he has not supported his argument with

4    sufficient evidence.  In particular, I do not have a sufficient

5    basis to disregard the binding judicial admission made by

6    Mr. Strand on behalf of defendants that Mr. Calle was

7    plaintiff's employer.  In order for me to disregard that

8    admission, I would need to be presented with "substantial"

9    evidence on the record to the contrary.  I do not have

10   substantial evidence to the contrary on this record; I have

11   Mr. Strand's argument, which suggests that there may have been

12   an error in the admission, but I do not have sufficient

13   evidence to do anything but accept Mr. Calle's admission.  As a

14   result, I must rule on the basis of Mr. Calle's admission.

15   Mr. Calle is represented by counsel in this litigation, who

16   filed and signed the answer, presumably in compliance with his

17   Rule 11 obligations.  Defendant Calle "voluntarily chose this

18   attorney as his representative in the action, and he cannot now

19   avoid the consequences of the acts or omissions of this freely

20   selected agent." *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34

21   (1962).  "Any other notion would be wholly inconsistent with

22   our system of representative litigation, in which each party is

23   deemed bound by the acts of his lawyer-agent and is considered

24   to have 'notice of all facts, notice of which can be charged

25   upon the attorney.'" *Id.* at 634 (quoting *Smith v. Ayer*, 101

G6RACAJ5ps                    Decision

1    U.S. 320, 326 (1879)).  Simply put, at the outset of this

2    litigation, Mr. Strand admitted that Mr. Calle was

3    Mr. Cajamarca's employer, and has provided me no basis to

4    disregard that admission.  If that was an error, the cost will

5    fall on Mr. Strand's client, Mr. Calle.  I cannot change the

6    facts presented to me at trial.

7            Therefore, I find that all three defendants are

8    employers within the meaning of the FLSA and New York Labor

9    Law, and are liable for any violations of those statutes.

10           III.  Overtime.  The FLSA embodies "a uniform national

11   policy of guaranteeing compensation for all work or employment

12   engaged in by employees covered by the Act."  *Tenn. Coal, Iron*

13   *& R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 602 (1944).

14   The FLSA provides that any employee who works more than 40

15   hours in a week is entitled to overtime pay for those hours in

16   excess of 40, at a rate "not less than one and one half times

17   the regular rate at which he is employed."  29 U.S.C.

18   § 207(a)(1).  The same is true under the regulations

19   implementing the New York Labor Law for hospitality workers

20   such as Mr. Cajamarca.  *See* N.Y. Regulations, Title 12, Section

21   146-1.4.

22           The New York Labor Law "is the state analogue to the

23   federal FLSA."  Thus, except for where they differ -- as I will

24   outline shortly -- "[c]ourts apply the same analysis for FLSA

25   and [NYLL] overtime claims..."  *Alvarez v. Michael Anthony*

G6RACAJ5ps                    Decision

1   *George Const. Corp.,* 15 F.Supp. 3rd 285, 291 (E.D.N.Y. 2014)

2   (internal citations and alterations omitted); *see also Kuebel*

3   *v. Black & Decker, Inc.,* 643 F.3d 352, 357 n.2 (2d Cir. 2011).

4           a.  Recordkeeping Requirements.  The FLSA requires

5   employers to "make, keep, and preserve" records of their

6   employees' "wages, hours, and other conditions and practices of

7   employment."  29 U.S.C. § 211(c); *see also* 29 C.F.R.

8   § 516.2(a).  Payroll records must be retained by employers for

9   a minimum of three years, and all other records must be

10  retained for a minimum of two years.  See 29 C.F.R. 516.5(a),

11  516.6.  These recordkeeping and retention requirements "are not

12  mere technicalities, but substantive obligations that are

13  'fundamental underpinnings' of the FLSA and critical to

14  ensuring the statute's effectiveness."  *Amaya v. Superior Tile*

15  *& Granite Corp.*, 10-cv-4525 (PGG), 2012 WL 130425, at *6

16  (S.D.N.Y. Jan. 17, 2012) (quoting *Wirtz v. Mississippi*

17  *Publishers Corp.*, 364 F.2d 603, 607 (5th Cir. 1966)).

18          b. The Supreme Court's Burden-Shifting Test.  An

19  employee suing his employer for unpaid overtime "has the burden

20  of proving that he performed work for which he was not properly

21  compensated."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S.

22  680, 687 (1946).  He must also prove "that the employer had

23  actual or constructive knowledge of that work."  *Kuebel*, 643

24  F.3d at 361.

25          In cases like this, courts use a burden-shifting test

G6RACAJ5ps                    Decision

1     set out by the Supreme Court in *Mt. Clemens*.  328 U.S. at

2     687-88.  The test does not presume that an employee's testimony

3     is credible; rather, the test recognizes that "it is the

4     employer who has the duty under bracket [the FLSA] to keep

5     proper records of wages, hours, and other conditions and

6     practices of employment and who is in a position to know and

7     produce the most probative facts concerning the nature and

8     amount of work performed."  *Id*.  Under this burden-shifting

9     test, where an employer's records are inaccurate or inadequate,

10    "an employee has carried out his burden if he proves that he

11    has in fact performed work for which he was improperly

12    compensated and if he produces sufficient evidence to show the

13    amount and extent of that work as a matter of just and

14    reasonable inference.  The burden then shifts to the employer

15    to come forward with evidence of the precise amount of work

16    performed or with evidence to negative the reasonableness of

17    the inference to be drawn from the employee's evidence.  If the

18    employer fails to produce such evidence, the court may then

19    award damages to the employee, even though the result be only

20    approximate."  *Id*. at 687-88.

21         First, I find that defendants' records for the hours

22    Mr. Cajamarca worked are both inaccurate and inadequate.

23    Mr. Cajamarca's pay stubs did not record his hours worked and

24    were an admittedly inaccurate statement of the amount he was

25    paid.  The time records offered by defendants are also

G6RACAJ5ps                    Decision

inaccurate in both the hours worked and pay reflected.  The

records offered by defendants as Exhibit A show that

Mr. Cajamarca was paid $450 for all but one week that he worked

at Arte Restaurant -- for some unexplained reason, the week of

June 19, 2014 he was paid $375.  The records also claim that

Mr. Cajamarca worked exactly 40 hours each and every week.  The

party disagree on many things in this lawsuit, but one thing

they both strenuously argue is that Mr. Cajamarca did not work

40 hours per week.  According to Mr. Cajamarca he worked more;

according to defendants he worked less.  In even

Mr. Hasangjikaj's version of events, the time records presented

by defendants were intentionally inaccurate.

         In addition, the checklist schedule provided by

defendants as part of Exhibit A is entirely irrelevant to this

litigation.  It is undated, and Mr. Cajamarca's name does not

appear on it.  Mr. Hasangjikaj testified today that this

document was created after Mr. Cajamarca's employment at Arte

Restaurant ended.  I don't see the bearing that it has on the

number of hours that he may have worked during the period of

his employment, and it cannot by any stretch of the imagination

be considered to be an accurate or adequate record for purposes

of this litigation.  As emphasized during Mr. Kumar's

cross-examination, it does not show even evidence that the

restaurant uses shifts for lunch and dinner.  It merely

provides a daily statement of each week's schedule, without

G6RACAJ5ps                    Decision

reference to lunch or dinner shifts.

Because I find that defendants' records are inaccurate and inadequate, the test in *Mt. Clemens* applies, and Mr. Cajamarca carries his burden if he proves that he in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. *See Mt. Clemens*, 328 U.S. at 687.

i.  Determining hours worked.  An employee may meet his burden of providing evidence sufficient "to show the amount and extent of the uncompensated work as a matter of just and reasonable inference" through "estimates based on his own recollection." *Kuebel*, 643 F.3d at 362 (collecting cases).  An employee has met his burden when he presents credible testimony and the defendants "fail[] to cast sufficient doubt on plaintiff's recollection of his hours." *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 337 (S.D.N.Y. 2005) (Sand, J.). While courts frequently find support for an employee's testimony through corroborating evidence, such as the testimony of the employer-defendants, *see, e.g.*, *YU G. Ke v. Saigon Grill, Inc.*, 595 F.Supp.2d 240, 251-52 (S.D.N.Y. 2008), or the employer's records, *see, e.g.*, *Alvarez v. Michael Anthony George Const. Corp.*, 15 F.Supp. 3rd 285, 291, n.2, 292-93 (E.D.N.Y. 2014) -- contrary to Mr. Strand's suggestion, there is no obligation for an employee to bolster otherwise credible

G6RACAJ5ps                    Decision

testimony with corroborating evidence in order to make out a

claim.

           I find that Mr. Cajamarca has met his burden.  Through

his credible testimony, he offered evidence that proved that he

performed work for which he was not properly compensated.

Mr. Cajamarca's testimony, moreover, is corroborated on several

important points by defendants' evidence -- they agree that

Mr. Cajamarca was paid $700 per week, that he was paid in a

combination of cash and check, that the payroll records are

inaccurate, and that Mr. Cajamarca's weekly schedule was "one

to two lunches per week and four to five dinners per week,"

which is consistent with Mr. Cajamarca's recollection that he

regularly worked lunch on Tuesday and Thursday and dinner on

Tuesday, Thursday, Friday, Saturday, and Sunday.

           The point on which the parties disagree is whether

Mr. Cajamarca worked 44.5 hours per week, as he claimed -- that

is, from 11:30 to 10 p.m. on Tuesday and Thursday, 3:30 p.m. to

12 a.m. on Friday and Saturday, and 3:30 to 10 p.m. on

Sunday -- or something less, as defendants' claim.  according

to Mr. Cajamarca, he worked this schedule with a 15- to

20-minute break for him to eat each day, and when he was

required to stay later than his usual schedule he was not given

additional pay.

           Defendants disagree, claiming that on days when

Mr. Cajamarca worked both lunch and dinner he was not working

G6RACAJ5ps                    Decision

1    between 3 or 4, when the lunch shift ended, and 5:00 p.m., when

2    the dinner shift began.  Mr. Hasangjikaj also testified that

3    Mr. Cajamarca frequently left work 30 to 60 minutes before the

4    scheduled end of the shift.  But defendants did not produce

5    credible evidence showing the precise amount of work performed

6    by Mr. Cajamarca.  In fact, as just discussed, none of the

7    records they produced showed even close to a "precise"

8    measurement of the work performed by plaintiff.  In addition,

9    Mr. Hasangjikaj's recollection of the hours worked by

10   Mr. Cajamarca is not clear -- he remembers that Mr. Cajamarca

11   worked one to two lunch shifts per week, that they were each

12   three to four hours long, and four to five dinner shifts that

13   were each five to six hours long, so that by his calculation

14   Mr. Cajamarca worked between 24 and 35 hours each week.  But

15   while Mr. Hasangjikaj testified that Mr. Cajamarca "never"

16   worked more than 40 hours in a week, he cannot testify with any

17   certainty as to what his schedule actually was, his worked

18   schedule actually was, and does not have the records that he is

19   statutorily obligated to keep to support his assertion.

20          Mr. Hasangjikaj's selective memory makes it difficult

21   for me to fully credit his testimony.  He does not remember the

22   plaintiff's schedule precisely.

23          Let me make one semantic point here briefly.  That is

24   the difference between schedule, i.e. posted schedule of the

25   period in which somebody might work and the hours that someone

G6RACAJ5ps                    Decision

actually worked.  So when I say that he does not remember the

plaintiff's schedule precisely, I am not saying that he does

not remember his shifts.  I am saying that he does not remember

the hours that the plaintiff worked on any given day or week or

month precisely.  The one fact that he recalls with complete

clarity regarding the plaintiff's schedule, understood in that

same way -- namely, that he never worked more than 40 hours --

is the one fact that, coincidentally, exculpates him from

liability.  Facing liability, Mr. Hasangjikaj has a personal

interest in testifying to the facts that he has, and I discount

his testimony as a result.  I also discredit his testimony

because of the manner in which he maintained time records for

all of his workers.  Those records were undeniably false.  I

understand Mr. Hasangjikaj argues that they were intentionally

false but done in order to overstate his hours.  The fact

remains that, for whatever reason, Mr. Hasangjikaj

intentionally presented employees' time records inaccurately.

That causes me to discredit his testimony regarding the actual

hours worked by his employees.  I simply do not find it

credible that he consistently reported that his employees

worked 40 hours each week, if in fact they consistently worked

considerably less than the amount of time, as he claims.

    Moreover, I do not find it credible that a cook, as he

has testified to, at a restaurant, never began work before the

restaurant opened to patrons.  If Arte Restaurant was going to

G6RACAJ5ps                    Decision

begin serving dinner at 5 p.m., common sense dictates, to me at

least, that it is more likely that Mr. Cajamarca was required

to arrive and begin work sooner, as he testified, rather than

at 5 p.m., when customers would begin to arrive, or might begin

to arrive.  He was involved in the preparation of food for

diners, after all.  Mr. Hasangjikaj's version of events would

have me believe that the chef began working at the same time as

customers began to enter the restaurant, without time to

prepare himself, his workstation, or food that customers might

order.  I find that to be less credible than plaintiff's

account.

          I also note that while defense counsel has repeatedly

argued that Arte Restaurant has never been accused of

underpaying its employees prior to this lawsuit, that there is

no evidence before me that supports that assertion.  As counsel

should know, arguments of counsel are not evidence; and I

cannot afford this unsubstantiated argument any weight in my

decision.

          Lastly, defendants' suggestion that "if the plaintiff

really did work the hours he claimed" there would be evidence

such as "a time-coded credit card purchase when he refilled his

MetroCard to take the subway home after work, or time-stamped

messages from the plaintiff's mobile device stating that he was

just leaving work."  Defs.' Br. 7.  Such conjecture, seeking to

inappropriately place the burden on the plaintiff, is precisely

G6RACAJ5ps                    Decision

the why the Supreme Court articulated the burden-shifting test

in *Mt. Clemens*.  It is the employer, not the employee, who is

obligated by law to keep accurate records of the time worked.

And "where the employer's records are inaccurate or

inadequate," the solution "is not to penalize the employee on

the ground that he is unable to prove the precise extent of the

uncompensated work" because "[s]uch a result would...allow the

employer to keep the benefits of an employee's labors without

paying due compensation."  *Mt. Clemens*, 328 U.S. at 687.

I have to comment briefly as well on the assumptions

implicit in this argument, namely, that Mr. Cajamarca has a

credit card, that he has a smartphone with unlimited text

capacity.  Both of those assumptions are unsubstantiated on the

evidence before me on the record.  If anything, the only actual

testimony presented, namely, that Mr. Cajamarca did not have a

bank account, go against the assumption that he should also

have a credit card.  While a lawyer might be expected to have

credit card records and text messages from his or her

cellphone, I'm not so sure that these arguments are well placed

in the context of Mr. Cajamarca.

In sum, having observed the testimony in court today,

I find Mr. Cajamarca's testimony to be credible.  As I said, I

note that it is corroborated by defendants on a number of

points, and with respect to the numbers of hours worked, I find

Mr. Cajamarca's testimony to be more credible than

1   Mr. Hasangjikaj's testimony.

2           Although neither of the parties addressed this point

3   in their pretrial memoranda or their arguments today, I would

4   like to briefly discuss whether Mr. Cajamarca is owed

5   compensation for the meal breaks.  Mr. Cajamarca has testified

6   that he had a 15- to 20-minute break to eat each day.  Under

7   the FLSA, "[b]ona fide meal periods are not work time" for

8   which an employee must be paid, but rest breaks -- also

9   referred to as coffee breaks or snack breaks -- are counted as

10  compensable time.  29 C.F.R. Section 785.18-19.  The

11  regulations describe rest breaks as from five to 20 minutes

12  long, while bona fide meal breaks are "[o]rdinarily 30 minutes

13  or more," although "under special conditions" they may be

14  shorter.  29 C.F.R. Section 785.19(a).  "The reasons for the

15  temporal distinction is that a shorter break is deemed to

16  predominantly benefit the employer by giving the company a

17  reenergized employee."  *Naylor v. Securiguard*, 801 F.3d 501,

18  505 (5th Cir. 2015) (citing 29 C.F.R. § 785.18).

19          For the reasons that I just discussed, I credit

20  Mr. Cajamarca's testimony that his meal break was 15 to 20

21  minutes long, and I do not credit Mr. Hasangjikaj's testimony

22  that his employees were given a full hour for a meal break.  In

23  this case there is no evidence of any special circumstances

24  that would turn a compensable 15-minute rest break into a

25  noncompensable bona fide meal break.  Therefore I find that

G6RACAJ5ps                    Decision

Mr. Cajamarca worked 44.5 compensable hours per week.

Having determined that Mr. Cajamarca was not properly compensated for all of the hours worked, I must now determine his regular rate of pay and the appropriate damages.

ii.  Determining an Employee's "Regular Rate" and Applicable Overtime Compensation.

1.  Regular Rate Under the FLSA.  Under the FLSA, an employee's regular rate "refers to the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945); *see also* 29 U.S.C. § 207(e). "The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek exclusive of overtime payments.  It is not an arbitrary label chosen by the parties; it is an actual fact." *Walling*, 325 U.S. at 424.  But where employees are paid a daily or weekly salary, as Mr. Cajamarca was, "[i]n order to evaluate an employer's FLSA compliance, wages must be expressed in terms of a regular hourly rate." *Adams v. Dep't of Juvenile Justice*, 143 F.3d 61, 66 (2d Cir. 1998).

Under the FLSA, "[t]here is a rebuttable presumption that a weekly salary covers 40 hours; the *employer* can rebut the presumption by showing an employer-employee agreement that the salary cover a different number of hours." *Giles v. City of New York*, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999) (emphasis

G6RACAJ5ps                        Decision

added).  But "[u]nless the contracting parties intend and

understand the weekly salary to include overtime hours at the

premium rate, courts do not deem weekly salaries to include

overtime premium for workers regularly logging overtime."*Id.*

(collecting cases).  I am to construe the FLSA overtime

provisions broadly and, as Judge Motley said in *Giles*, "a

finding that a salary included overtime, in the absence of

*proof of an agreement so stating*, would be the sort of 'narrow,

grudging' FLSA application that the [Supreme] Court rejected

soon after enactment."  *Id.* (emphasis added) (quoting *Tenn.*

*Coal, Iron & R.R. Co., et al.*, 321 U.S. 590, 597 (1944)).

         Such an agreement must be express or explicit.  *See,*

*e.g.*, *Giles*, 41 F. Supp. 2nd at 317, *Amaya v. Superior Tile &*

*Granite Corp.*, No. 10-cv 4525 (PGG), 212 WL 130425, at *9

(S.D.N.Y. Jan. 17, 2012).  "In the absence of any written

instrument memorializing the parties' intention, the Court must

infer the terms of their agreement from the entire course of

their conduct based on the testimonial and documentary evidence

in the record." *Moon v. Kwon*, 248 F. Supp. 2d 201, 206

(S.D.N.Y. 2002).  And "[e]ven when wages exceed the minimum

prescribed by Congress, the parties to the contract must

respect the statutory policy of requiring the employer to pay

one and one half times the regular hourly rate for all hours

actually worked in excess of 40." *Adams*, 143 F.3d at 67-68

(quoting *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 42

G6RACAJ5ps                    Decision

 1    (1944)).

 2              I find that there was no express agreement between

 3    Mr. Cajamarca and defendants that the weekly salary was meant

 4    to compensate Mr. Cajamarca for overtime work.  Mr. Cajamarca

 5    testified that he was never told, at the time he was hired or

 6    any later date, that his weekly salary was supposed to cover

 7    any overtime premium.  And defendants have not provided any

 8    evidence of an express agreement contradicting Mr. Cajamarca's

 9    testimony.  Therefore, the FLSA's presumption that a weekly

10    salary covers 40 hours is applicable here.

11              2.  Regular Rate Under the New York Labor Law.

12              Prior to January 1, 2011, restaurant employees in New

13    York could be paid a weekly salary, instead of being paid an

14    hourly rate.  Beginning January 1, 2011, however, labor

15    regulations for restaurant workers require that employees be

16    paid hourly: "[e]mployers *may not* pay employees on a daily,

17    weekly, salary, piece rate or other non-hourly rate basis."

18    N.Y. Regulations, Title 12, Section 146-2.5 (emphasis added).

19    The regulations then provide that: "If an employer fails to pay

20    an employee an hourly rate of pay, the employee's regular

21    hourly rate of pay shall be calculated by dividing the

22    employee's total weekly earnings, not including exclusions from

23    the regular rate, by the lesser of 40 hours or the actual

24    number of hours worked by that employee during the

25    workweek."N.Y. Regulations, Title 12, Section 146-2.5.  Thus,

G6RACAJ5ps                    Decision

under the New York Labor Law, like the FLSA, the regular rate
of pay is calculated by dividing an employee's total weekly
salary by 40.  This calculation of the "regular rate" is then
used to determine an employee's applicable overtime rate of
"1 1/2 times the employee's regular rate for hours worked in
excess of 40 hours in one workweek."  N.Y. Regulations, Title
12, Section 146-1.4.

Because I have found that Mr. Cajamarca worked 44.5
hours per week, his regular rate is calculated by dividing his
weekly salary of $700 by 40 to obtain a regular hourly rate of
$17.50.  His overtime rate is $17.50 times 1.5, which is
$26.25.

I calculate Mr. Cajamarca's overtime damages to be
$8,505, which is 72 weeks without overtime times 4.5 hours per
week overtime times $26.25.  That equals $8,505.

IV.  Spread of hours.

In New York, a restaurant employee is entitled to an
extra hour's pay at the basic minimum wage rate on each day he
works for which "the spread of hours exceeds 10."  N.Y.
Regulations, Title 12, Section 146-1.6 (and Section 137-1.7 for
years prior to 2011).  "The spread of hours is the length of
the interval between the beginning and end of an employee's
workday," and "includes working time plus time off for meals
plus intervals off duty."  *Id*.  For example, Title 12 Section
146-1.6 gives the example of an employee who works from 11:30

a.m. to 3 p.m. and then again from 4 p.m. to 10 p.m.  Although

only nine and a half hours were worked during that workday, the

spread of hours is ten and a half, and the employee would be

entitled to spread of hours pay.  *Id.*

Prior to 2011, a restaurant employee was entitled to

an extra hour's pay at the basic minimum hourly rate "in

addition to the minimum wages otherwise required" on each day

he worked for which the spread of hours exceeded ten hours.

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234,

241-42 (2d Cir. 2011) (quoting N.Y. Regulations, Title 12,

Section 137-1.7).

Courts in this circuit have adopted the New York

Department of Labor's position that the plain language of the

pre-2011 spread of hours position indicates that it does not

apply to workers whose compensation is already sufficiently

above the minimum wage rate.  *See* N.Y.S. Dep't of Labor opinion

letter dated March 16, 2017, file no. RO-07-0009, at 2,

*available at* https://labor.ny.gov/legal/counsel/pdf/Minimum%20

Orders/RO-07-0009A.pdf.  *See*, *e.g.*, *Martinez v. Hilton Hotels

Corp.*, 930 F. Supp. 2d 508, 531 (S.D.N.Y. 2013); *Flores v.

Anjost Corp.*, 284F F.R.D. 112, 118-19 (S.D.N.Y. 2012); *Zubair

v. EnTech Eng'g P.C.*, 808 F. Supp. 2d 592, 601 (S.D.N.Y. 2011).

However, as of January 1, 2011, restaurant employees

are entitled to such supplemental wages "regardless of a given

employee's regular rate of pay."  N.Y. Regulations, Title 12,

G6RACAJ5ps                    Decision

Section 146-1.6.  Therefore, even a restaurant employee who is

paid substantially more than the minimum wage is entitled to

spread of hours compensation, where applicable, for workdays

occurring after January 1, 2011.  See *Martinez v. Hilton Hotels*

*Corp.*, 930 F. Supp. 2d 508, 531-32 (S.D.N.Y. 2013) (citing N.Y.

Regulations, Title 12, Section 146-1.6).

          Defense counsel, in his memorandum of law, asks that

the Court find that plaintiff was not entitled to spread of

hours pay for two reasons: first, because Mr. Cajamarca never

worked a shift of more than ten hours, and, second, because the

New York Labor Law -- according to defense counsel -- only

requires payment of minimum wage plus an additional hour at

minimum wage and Mr. Cajamarca was already compensated beyond

the applicable minimum wage rates.  *See* Defs.' Proposed

Conclusions of Law ¶ 2.

          With respect to the first point, as I have just

explained, the law makes it very clear -- to the point of

providing an example of a hypothetical employee whose

hypothetical hours are quite similar to Mr. Cajamarca's -- that

the length of a shift is irrelevant for spread of hours pay.

What matters is the time the employee first begins work and the

time he finally concludes his work on a given day.

          With respect to defense counsel's second point,

counsel clearly ended his research before learning that the

spread of hours minimum wage rule was no longer effective as of

G6RACAJ5ps                    Decision

January 1, 2011.  Mr. Cajamarca was employed by Arte Restaurant
during 2014 and 2015, and so is entitled to spread of hours pay
despite the fact that his regular rate was well above minimum
wage.

          Between April 25, 2014 and September 10, 2015,
Mr. Cajamarca worked from 11:30 a.m. to 10:00 p.m. on Tuesdays
and Thursdays, and is entitled to spread of hours compensation
for those workdays.  I calculate Mr. Cajamarca's total spread
of hours damages at $1,207.50.

          I calculate that as follows: 35 weeks in 2014 times
two days per week times $8 minimum wage per 12 NYCRR
146-1.2(a)(2) equals $560; 37 weeks in 2015 times two days per
week times $8.75 minimum wage per 12 NYCRR 146-1.2(a)(3) equals
$647.50.  The sum of those two numbers is $1,207.50.

          V.  Liquidated Damages.

          a.  FLSA Liquidated Damages.  Employees are also
entitled to liquidated damages under the FLSA in an amount
equal to their unpaid wages, unless "the employer shows to the
satisfaction of the court that [his] act or omission...was in
good faith and that he had reasonable grounds for believing
that his act or omission was not a violation of the Fair Labor
Standards Act."  29 U.S.C. § 260; *see also* 29 U.S.C. § 216(b).
Liquidated damages under the FLSA are not imposed as a penalty
but as "compensation to the employee occasioned by the delay in
receiving wages caused by the employer's violation of the

G6RACAJ5ps                    Decision

FLSA." *McLean v. Garage Management Corp.*, no. 10-cv-3950
(DLC), 2012 WL 1358739, at *5 (S.D.N.Y. April 19, 2012)
(quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d
Cir. 1999)); *see also Overnight Motor Transportation Co. v.
Missel*, 316 U.S. 572, 583 (1942).

          Defendants may *only* avoid liquidated damages under the
FLSA if they demonstrate that they "acted in subjective good
faith with objectively reasonable grounds for believing that
[their] acts or omissions did not violate the FLSA." *Barfield
v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 150
(2d Cir. 2008); *see also* 29 U.S.C. § 260.  Defendants' burden
in this regard is high: "[t]o establish the requisite
subjective good faith, an employer must show that it took
active steps to ascertain the dictates of the FLSA and then
act[ed] to comply with them." *McLean*, 2012 WL 1358739, at *5
(quoting *Barfield*, 537 F.3d at 150).  In cases such as this
one, "double damages bracket [are] the norm and single damages
the exception." *Id*. (quoting *Herman*, 172 F.3d at 142).

          I find that the defendants did not meet their burden.
They did not establish that they took active steps to ascertain
the dictates of the FLSA and then acted to comply with them.
In fact, they did not even offer evidence attempting to show
that they acted in subjective good faith.

          Mr. Cajamarca is therefore entitled to FLSA liquidated
damages in the amount of his unpaid overtime wages, $8,505.

G6RACAJ5ps                    Decision

1          b. NYLL Liquidated Damages.  Employees may also

2     recover liquidated damages under the New York Labor Law.

3     Similar to the FLSA, employees are entitled to liquidated

4     damages under the New York Labor Law "unless the employer

5     proves a good faith basis to believe that its underpayment of

6     wages was in compliance with the law."  N.Y. Lab. Law

7     § 198(1-a).  For any New York Labor Law violations after April

8     9, 2011, plaintiffs are entitled to 100 percent of the amount

9     of their unpaid wages.  New York Lab. Law §§ 198(1-a), 663(1).

10          c. Denial of Cumulative, or Stacked, Liquidated

11    Damages.  "There is no appellate authority as to whether a

12    plaintiff may recover cumulative (sometimes called

13    'simultaneous' or 'stacked') liquidated damages under the FLSA

14    and NYLL, and the district courts in this Circuit are deeply

15    divided."  *Inclan v. New York Hospitality Group, Inc.*, 95

16    F.Supp. 3rd 490, 505 (S.D.N.Y. 2015).  Plaintiff urges the

17    Court to award cumulative liquidated damages under both of the

18    statutes, arguing that because liquidated damages under the

19    FLSA are compensatory, while under the NYLL they are punitive,

20    he is entitled to both.  Multiple district courts in this

21    circuit have so held.  *See Hernandez v. Jrpac, Inc.*,

22    No. 14-cv-4176 (PAE), 2016 WL 3248493 at *34 (S.D.N.Y. June 9,

23    2016) (collecting cases); and *Inclan*, 95 F. Supp. 3d at 505

24    (same).  The distinction between the purposes of the two

25    statutes, however, was premised on the New York Labor Law's

G6RACAJ5ps                    Decision

1    requirement that an employee establish that an employer's

2    violation was willful in order to be entitled to liquidated

3    damages.  *Hernandez* 2016 WL 3248493, at *34.

4            As plaintiff acknowledges *(see* Pl.'s Pretrial Mem. of

5    Law at 9), in 2009 the New York Labor Law was amended to, among

6    other things, change the burden of proof required to establish

7    a claim for liquidated damages.  Prior to the 2009 amendments,

8    the New York Labor Law required an employee to show that his

9    employer's violation was "willful" in order to collect

10   liquidated damages under the New York Labor Law; in addition,

11   prior to the amendments, the employee could only recover 25

12   percent of his unpaid wages as liquidated damages.  *Id.*  The

13   2009 amendments to the New York Labor Law created a burden of

14   proof akin to the that of the FLSA -- the statute no longer

15   requires a showing that the violation was willful.  Instead, an

16   employee is now entitled to liquidated damages "except where

17   the employer demonstrates good faith," and may recover 100

18   percent of the wages owed as liquidated damages.  *Id.* (citing

19   2010 N.Y. Sess. Law Ch. 564 (S. 8380) and 2009 N.Y. Sess. Law

20   Ch. 372 (A. 6963)).

21           As my colleague, Judge Engelmayer, recently explained,

22   "in light of the convergence that the amendments effect between

23   the New York Labor Law's and the FLSA's liquidated damages

24   provisions...the earlier distinction between the FLSA's

25   compensatory provision and the New York Labor Law's punitive

G6RACAJ5ps                    Decision

1    provision" is now "elusive."  In light of the elimination of

2    the "willfulness" requirement from the New York Labor Law in

3    the 2009 amendments, I find it difficult to conclude that

4    liquidated damages under the New York Labor Law are "punitive"

5    rather than merely compensatory.  As a result, this Court now

6    joins the courts in this district that have held that, after

7    the 2009 amendments to the New York Labor Law, permitting

8    stacked liquidated damages would amount to an impermissible

9    double recovery.  *See Id.* (collecting cases); *see also Inclan*,

10   99 F.Supp. 3d 490 (2015) (holding that "the recent amendments

11   to the New York Labor Law have undermined the basis" for a

12   distinction between the two statutes).

13           Because Mr. Cajamarca is entitled to liquidated

14   damages for his unpaid overtime wages damages under the FLSA,

15   he cannot also recover liquidated damages for unpaid overtime

16   under the New York lay law.  He may, however, collect

17   liquidated damages for his unpaid spread of hours wages under

18   the New York Labor Law.  Therefore, Mr. Cajamarca is entitled

19   to New York Labor Law liquidated damages in the amount of

20   $1,207.50 for unpaid spread of hours pay.

21           VI.  Other Awards.

22           a.  Pre-Judgment Interest.

23           Under New York law, prejudgment interest -- like both

24   FLSA and New York Labor Law liquidated damages awards -- is

25   compensatory.  *See J. D'Addario & Co. v. Embassy Indus., Inc.*,

G6RACAJ5ps

1    20 N.Y.3d 113, 117 (2012) ("The principle behind prejudgment

2    interest is that the breaching party should compensate the

3    wronged party for the loss of use of the money.")  thus,

4    plaintiffs cannot recover prejudgment interest in addition to

5    liquidated damages.  *See Brooklyn Savings Bank v. O'Neil*, 324

6    U.S. 697, 715 (1945) ("To allow an employee to recover the

7    basic statutory wage and liquidated damages, with interest,

8    would have the effect of giving an employee double compensation

9    for damages rising from delay in the payment of the basic

10   minimum wages.").

11        Therefore, I will not award Mr. Cajamarca prejudgment

12   interest.

13        b. Costs and Attorney's Fees.

14        Both the FLSA and New York Labor Law allow prevailing

15   plaintiffs to recover costs and reasonable attorney's fees.

16   *See* 29 U.S.C. § 216(b); New York Lab. Law § 663(1).  Plaintiff

17   therefore may recover both costs and reasonable attorney's

18   fees.

19        Now, for the foregoing reasons, judgment will be

20   entered in favor of Mr. Cajamarca in the total amount of

21   $19,425, and costs and attorney's fees in an amount to be

22   determined later.

23        Counsel, I am now going to set a schedule for

24   submission of applications for attorney's fees and costs.

25   Mr. Kumar, by when can you submit your application for fees and

G6RACAJ5ps

1    costs?

2                    MR. KUMAR:  Three or four weeks, your Honor.

3                    THE COURT:  Thank you.

4                    Mr. Strand, I'm going to propose to set July 18 as the

5    deadline for Mr. Cajamarca's application for attorney's fees

6    and costs.  Is that acceptable to you?

7                    MR. STRAND:  Yes, your Honor.

8                    THE COURT:  Thank you.

9                    Mr. Cajamarca's application for attorney's fees and

10   costs will be submitted no later than July 18, 2016.

11   Defendants' opposition, if any, to the application for fees and

12   costs is due two weeks after service of plaintiff's

13   application.

14                   That concludes my decision in this matter.  Is there

15   anything else that we should discuss before we adjourn this

16   trial?  Mr. Kumar?

17                   MR. KUMAR:  Yes, your Honor.  I was wondering if there

18   would be a chance for me to reply to defendants' opposition to

19   Mr. Cajamarca's application for attorney's fees and costs.

20                   THE COURT:  Thank you very much.  I appreciate you

21   raising that.  Yes, you may.  Any reply will be due no later

22   than one week following service of the opposition.

23                   MR. KUMAR:  Thank you, your Honor.

24                   THE COURT:  Thank you.

25                   Anything else from counsel for defendants?

G6RACAJ5ps

1          MR. STRAND:  No, thank you, Judge.

2          THE COURT:  Thank you very much.

3          Good.  Thank you all for your arguments, factual

4     presentation here today.  I would provide comments on trial

5     practice here, but I will do that at a separate time.

6          Good.  Is there anything else we should discuss?

7     Seeing none...

8          MR. KUMAR:  Nothing from the plaintiff, your Honor.

9          THE COURT:  Thank you very much.  This proceeding is

10    adjourned.

11                             o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX OF EXAMINATION

2     Examination of:                                    Page

3     LUIS CAJAMARCA

4     Direct By Mr. Kumar  . . . . . . . . . . . . .13

5     Cross By Mr. Strand  . . . . . . . . . . . . .14

6     AZEM HASANGJIKAJ

7     Direct By Mr. Strand . . . . . . . . . . . . .20

8     Cross By Mr. Kumar . . . . . . . . . . . . . .26

9     Redirect By Mr. Strand . . . . . . . . . . . .58

10                            PLAINTIFF EXHIBITS

11    Exhibit No.                                    Received

12     P7   . . . . . . . . . . . . . . . . . . . . .14

13                            DEFENDANT EXHIBITS

14    Exhibit No.                                    Received

15     2   . . . . . . . . . . . . . . . . . . . . .22
       1   . . . . . . . . . . . . . . . . . . . . .24
16

17

18

19

20

21

22

23

24

25